## IN THE COURT OF APPEALS OF TENNESSEE, AT JACKSON

FILED

**November 2, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

|  |  |  |
|---|---|---|
| **VIRGINIA LYNN WOOLSEY**, | ) | Shelby County Juvenile Court |
|  | ) | No. C-4930 |
| Plaintiff/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9706-JV-00125 |
|  | ) |  |
| **DOUGLAS HARMON McPHERSON**, | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

From the Juvenile Court of Shelby County at Memphis
**Honorable A. V. McDowell, Special Judge**

**Wilburt J. Chiapella**, Memphis, Tennessee
Attorney for Plaintiff/Appellant.

**Kimbrough B. Mullins**, Memphis, Tennessee
**David E. Caywood**, Memphis, Tennessee
Attorneys for Defendant/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**TOMLIN, Sp. J.**: (Concurs)

Plaintiff Virginia Lynn Woolsey appeals the trial court's order removing Jennifer McPherson from her custody and placing the child in the custody of Defendant Douglas Harmon McPherson. McPherson appeals the trial court's order requiring him to pay the $15,000 fee of the Guardian ad Litem. We affirm in all respects.

## I. Procedural History

Jennifer McPherson, the nonmarital child of Woolsey and McPherson, was born on November 13, 1991. On May 20, 1992, Woolsey brought an action to establish Jennifer's paternity. The matter was heard by a juvenile court referee who found that McPherson was Jennifer's father and issued recommendations under which McPherson would have visitation with Jennifer. Woolsey then requested that the matter be reheard by a judge. After a rehearing, the trial judge issued an order consistent with the recommendations of the referee.[1] On April 16, 1993, McPherson filed a petition for a change of custody. After hearing the petition for a change of custody on October 12, 1993, the trial court took the matter under advisement and issued a temporary order providing that custody of Jennifer should remain with Woolsey. A final order was entered on August 2, 1994 voluntarily dismissing McPherson's petition for a change of custody. McPherson filed a second petition for a change of custody on April 30, 1996. After hearing twenty-two days of testimony from twenty-six witnesses and examining ninety-seven trial exhibits, the court granted McPherson's petition to change custody and ordered McPherson to pay the fee of the Guardian ad Litem. Woolsey appeals the trial court's ruling with respect to the change of custody and McPherson appeals the trial court's ruling regarding the payment of the Guardian ad Litem's fee. Both Woolsey and McPherson request reimbursement from the other party for attorney fees and other expenses

---

[1]The custody and visitation arrangement ordered by the trial court has been frustrated by ongoing conflict and a general lack of cooperation between Woolsey and McPherson. This is evidenced by numerous petitions and motions filed by the parties in this cause. They include as follows: "Petition For Citation For Contempt," "Motion For Protective Order," "Petition For Immediate Injunctive Relief," "Petition To Cite Virginia Lynn Woolsey In Contempt," "Amended Petition For Contempt And Petition For Change Of Custody," "Motion To Compel Discovery And For Sanctions," "Petition To Modify Christmas Vacation And Extend Visitation To Allow Visitation With Paternal Grandparents," "Motion For Temporary Modification Of Visitation Order," "Petition To Cite Respondent In Contempt," "Petition For Citation For Contempt Of Court," "Petition To Appoint Guardian Ad Litem And To Enforce Court Orders With Respect To Psychological Evaluations And Joint Counseling," "Petition For Christmas Vacation And Makeup Wednesday Night Visitation," "Amendment To Petition Regarding Christmas Visitation And Wednesday Makeup Visitation," and "Petition For Contempt And For Specific Visitation."

associated with this appeal.

## II. Change of Custody

As an initial matter, we note that trial courts have wide discretion in cases involving child custody. *See, e.g., Gaskill v. Gaskill,* 936 S.W.2d 626, 631 (Tenn. App. 1996); Tenn. Code Ann. § 36-6-101(a)(2) (Supp. 1997)(providing that the trial court "shall have the widest discretion to order a custody arrangement that is in the best interest of the child"). Consistent with this general principle, our review of the instant case is *de novo* on the record, accompanied by a presumption of correctness of the findings below. *See, e.g., Gaskill,* 936 S.W.2d at 631. We may not reverse the judgment of the trial court unless it is contrary to the preponderance of the evidence. *See Haas v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984); T.R.A.P. 13(d).

In matters of initial child custody, the trial court seeks to determine what would be in the best interest of the child. *See, e.g., Varley v. Varley,* 934 S.W.2d 659, 665 (Tenn. App. 1996)(citing *Koch v. Koch,* 874 S.W.2d 571, 575 (Tenn. App. 1993)); Tenn. Code Ann. § 36-6-106 (1996). This determination is based on the court's assessment of the comparative fitness of the parties seeking custody in light of the particular circumstances of the case. *See Ruyle v. Ruyle,* 928 S.W.2d 439, 442 (Tenn. App. 1996); *Matter of Parsons,* 914 S.W.2d 889, 893 (Tenn. App. 1995). When making this assessment, the court will consider all relevant factors, including the following:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's

interactions with the child.

Tenn. Code Ann. § 36-6-106 (1996). *See also Gaskill,* 936 S.W.2d at 630 (listing additional factors that may be considered when making a child custody determination).

Once the trial court has made an initial determination with respect to child custody, it may not entertain a subsequent petition to modify custody absent a material change in circumstances such that the welfare of the child demands a redetermination. *See, e.g., Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn. App. 1995). A material change in circumstances justifying modification of a child custody order may include factors arising subsequent to the initial determination or changed conditions that could not be anticipated at the time of the original order. *See Blair v. Badenhope,* 940 S.W.2d 575, 576 (Tenn. App. 1996)(citing *Dalton v. Dalton,* 858 S.W.2d 324, 326 (Tenn. App. 1993)). If the trial court finds that there has, in fact, been a material change in circumstances, it will then consider the petition to modify custody using a best interests standard.

In the instant case, the trial court originally determined that it was in Jennifer's best interest for her to be in the custody of Woolsey. Thus, in order for the trial court to consider McPherson's petition to remove Jennifer from Woolsey's custody and place the child in his own custody, it must first find that there has been a material change of circumstances.

McPherson's petition for a change of custody alleges, among other things, that Woolsey 1) dresses Jennifer in dirty clothing and subjects the child to dirty living conditions, 2) fails to provide Jennifer with necessary medical care, 3) fails to place Jennifer in a child safety seat while riding in the car, 4) uses foul and abusive language toward McPherson in Jennifer's presence, 5) attempts to prevent Jennifer from maintaining a relationship with McPherson and his family, and 6) makes inappropriate comments in front of Jennifer regarding "who McPherson is sleeping with." At this stage of our inquiry, we do not speculate as to the truth or falsity of these allegations. We note, however, that these incidents of misconduct allegedly occurred subsequent to the trial court's initial custody determination and, if proven, would constitute a serious threat to Jennifer's physical and psychological well being. We thus conclude that McPherson's petition alleged a material

change of circumstances affecting the welfare of Jennifer. Accordingly, we find that the trial court did not err in considering McPherson's petition to change custody.

We next consider whether the trial court erred in finding that it is in Jennifer's best interest to remove her from the custody of Woolsey and place her in the custody of McPherson. The proof presented regarding the parental fitness of Woolsey and McPherson is voluminous. Because we are of the opinion that the most probative pieces of evidence in the instant case are those elicited from disinterested parties, our discussion of the proof focuses on the evidence contained in reports submitted by the Department of Human Services, the Center for Children in Crisis, and the Guardian ad Litem.

In April of 1995, the Department of Human Services (DHS)[2] became involved in this matter after receiving a report of suspected neglect and physical abuse of Jennifer on the part of Woolsey. A DHS counselor investigated the allegations and determined that they were unfounded, stating the Woolsey and Jennifer appeared to share a close bond with one another. In February of 1996, the DHS received a report of possible sexual abuse of Jennifer by McPherson. Jennifer was physically examined at the Sexual Assault Resource Center but the findings of this examination were inconclusive. A counselor from the DHS spoke with Woolsey, McPherson, Jennifer, and B.J. Garner, who allegedly witnessed sexual abuse on the part of McPherson against one of his female acquaintances. The DHS then referred this matter to the Le Bonheur Center for Children in Crisis (CCC) for an evaluation.

A five member team from the CCC interviewed Woolsey, McPherson, and Jennifer and conducted psychological evaluations of both Woolsey and McPherson.[3] McPherson's

---

[2]In 1996, the Department of Human Services was replaced by the Department of Children's Services. *See* Tenn. Code Ann. § 37-5-101 (1996). For purposes of this opinion, we will refer to this entity as the Department of Human Services or DHS.

[3]This team consisted of a social worker, a psychological examiner, two psychologists, and a psychiatrist. The social worker, Joanna E. Morat, interviewed Woolsey, McPherson, Jennifer, and Woolsey's father. Earle Donelson, the psychological examiner, interviewed Woolsey and evaluated her performance on a variety of psychological tests. Dr. Koranek, a psychologist, interviewed McPherson and evaluated his performance on a variety of psychological tests. Dr. Gentry, also a psychologist, reviewed the test data obtained by Earle Donelson and participated in the writing of Donelson's report. Dr. Holman, the psychiatrist, interviewed Jennifer. After these individual interviews were concluded, the five team members met to assess the case and make

psychological evaluation was inconclusive regarding whether he had ever engaged in child abuse. Woolsey's psychological evaluation, however, suggested "serious problems in her parenting practices, as well as in her own psychological functioning." The CCC report noted behaviors on the part of Woolsey demonstrating impaired insight and judgment with respect to Jennifer's healthy development as follows:

> [T]he child's mental status examination at CCC reveals that she is experiencing coaching from her mother, and that Ms. Woolsey rebuffs the child for expressing positive feelings about Mr. McPherson. Of further concern is Ms. Woolsey's exploitation of Jennifer by encouraging developmentally inappropriate behavior, e.g., consistently referring to her as 'the baby', reportedly allowing the child to suck Ms. Woolsey's thumb, and sleeping and bathing with Jennifer; exploitation also has occurred with Ms. Woolsey photographing Jennifer's genital and buttocks areas. Finally, Jennifer apparently is denied healthy independent peer interaction; contact with the extended paternal family is disapproved by Ms. Woolsey. All these concerns support the conclusion of emotional child abuse by Ms. Woolsey toward Jennifer.

The final recommendation of the CCC team was that Jennifer be removed from Woolsey's custody and that Woolsey's visitation with Jennifer be supervised by a neutral third party.

After receiving the final report of the CCC, the DHS issued its own report and recommendations. These recommendations were based on the findings of the CCC evaluation as well as DHS's own independent investigation. The DHS found that Woolsey and Jennifer appear to have a "strange and somewhat abnormal relationship." This conclusion was based on several disclosures by Woolsey to a DHS counselor indicating that 1) Woolsey and Jennifer take daily baths together, 2) Woolsey has taken numerous photographs of Jennifer's private parts in an effort to substantiate her allegations of sexual abuse on the part of McPherson, 3) Woolsey uses highly sexualized language, 4) Jennifer is reared in a highly restricted or isolated environment, and 5) Woolsey has a "belligerent, hostile and revengeful attitude" toward McPherson. The final recommendation of the DHS was that Jennifer be removed from the custody of Woolsey and placed in the custody of McPherson.

_____

recommendations regarding Jennifer's welfare. These findings and recommendations are contained in a final "Multidisciplinary Team Report" dated May 22, 1996.

On November 29, 1995, the trial court appointed a guardian ad litem to act on behalf of Jennifer in matters coming before the court. The Guardian ad Litem conducted a thorough investigation. She interviewed both Woolsey and McPherson and visited with Jennifer on two occasions, once at Woolsey's home and once at the home of McPherson. The Guardian ad Litem also interviewed numerous persons at the request of the parties, interviewed all of the attorneys previously involved in this matter, and attended a meeting of the five members of the CCC team. In her report, the Guardian ad Litem expressed concern regarding the CCC investigation. She alleged that, during the CCC meeting she attended, three of the participants acted in an unprofessional manner and another participant left the meeting before its conclusion. Additionally, the Guardian ad Litem noted that the original recommendation of the social worker from the CCC was that Jennifer be placed in a foster home rather than in the custody of McPherson. The final recommendation of the Guardian ad Litem was that Jennifer remain in the custody of Woolsey but that McPherson be allowed visitation.

We have no doubt that both Woolsey and McPherson love Jennifer and are willing and able to provide her with the basic necessities of life. As we noted in *Varley v. Varley*, 934 S.W.2d 659 (Tenn. App. 1996), "[w]hen loved by both parents, children should be taught to love and respect each parent equally." *Id*. at 667. The evidence in the instant case suggests that Woolsey discourages Jennifer from developing a loving and respectful relationship with McPherson. Woolsey apparently does not want McPherson to have visitation with Jennifer or to be involved in Jennifer's education, religion, or upbringing. Woolsey allegedly makes disparaging remarks about McPherson in Jennifer's presence and punishes Jennifer for expressing affection for or a desire to visit McPherson. Woolsey reportedly encourages Jennifer to refer to McPherson as "Doug" rather than "Dad" or "Daddy." Finally, Woolsey has openly defied the orders of the trial court with respect to visitation by McPherson and his extended family. We are extremely concerned that these attempts on the part of Woolsey to alienate Jennifer from McPherson may result in serious consequences to the child's psychological well being.

The trial court determined that it is in the best interest of Jennifer to remove her from the custody of Woolsey and place the child in the custody of McPherson. Based on our review of the record, we cannot say that the evidence preponderates against this finding. We therefore uphold

the order of the trial court granting McPherson's petition to change custody.

### III. *Guardian Ad Litem Fee*

The trial court ordered McPherson to pay the $15,000 fee of the Guardian ad Litem. In child custody cases, the trial court is given wide discretion with respect to the awarding of fees. *See Salisbury v. Salisbury,* 657 S.W.2d 761, 770 (Tenn. App. 1983). We will not interfere with the trial court's decision regarding the proper assessment of fees unless there has been a clear abuse of discretion. *See id.* at 770. We recognize that ability to pay is not a controlling consideration when determining fee awards in custody cases. *See Sherrod v. Wix,* 849 S.W.2d 780, 785 (Tenn. App. 1992). The relative wealth of the parties, however, is one factor to be considered. In the instant case, it appears that McPherson's resources are far more extensive than those of Woolsey. We do not find that the trial court abused its discretion in charging the fee of the Guardian ad Litem to McPherson.

### IV. *Attorney's Fees and Expenses on Appeal*

Both Woolsey and McPherson have asked to be awarded attorney fees and expenses incurred in connection with this appeal. We do not find any basis upon which to award attorney fees or expenses in this matter. The requests of both Woolsey and McPherson are therefore denied.

### V. *Conclusion*

The order of the trial court granting McPherson's petition to change custody and charging the fee of the Guardian ad Litem to McPherson is affirmed. Issues were raised on appeal by both parties. In our discretion, we tax costs of this appeal to McPherson, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)



_____
TOMLIN, Sp. J. (Concurs)