## WEAVER v. WEAVER.—261 S. W. (2d) 145.

Eastern Section.   March 11, 1953.

Petition for Certiorari denied by Supreme Court, July 29, 1953.

John S. Wrinkle, of Chattanooga, and McCanless & Taylor, of Morristown, for appellant.

Carlyle S. Littleton and Maurice M. Weaver, both of Chattanooga, for appellee.

McCAMPBELL, Special Judge. This is an appeal from the Chancery Court for Hamilton County, at Chattanooga, Honorable Raulston Schoolfield, Chancellor by interchange for the Honorable Alvin Zeigler, Chancellor.

The cause initially commenced as an action for divorce in the Chancery Court for Hamilton County, in 1946, wherein the complainant, Maurice Weaver, instituted the action against the defendant, Lois Harrell Weaver. There was a partial hearing of this cause before the Chancellor and in the course of the proceedings the parties agreed upon a decree which awarded an absolute divorce, based on cruel and inhuman treatment, to the complainant, Maurice Weaver, and fixed the custody of the child born of the marriage of the parties, Max Weaver, as alternating each three months with each parent. At the time of the entry of the final decree in this case the infant was then less than four years old. This arrangement appears to have been worked out by agreement of the parties but was approved by the Chancellor. Unfortunately, it was the source of the prolonged controversy which subsequently arose between them, resulting in this appeal.

The arrangement for rotating custody of the infant continued with more or less satisfactory results until the spring of 1948, when the infant was then approaching school age. It became manifest apparently to both parties about the same time that rotating custody could not continue with the infant in school, when the father was living in Chattanooga and the mother in Morristown, Tennessee.

The father, however, first broke the ice by instituting this proceeding to modify the decree of the Chancellor, setting forth as the reason therefor that circumstances had changed in that the child was approaching school

age, that it was necessary for one or the other parent to have the predominant or exclusive custody of the child, and that the mother was unfit to have it. This petition was met by an answer and cross-bill from the mother agreeing that the circumstances had changed, but asserting that she should have the predominant or exclusive custody of the child because the father was unfit to have it.

In the meantime there had been a change of other factors in the situation. The Chancellor who heard the original cause in 1946, no longer sat as such, but had become a member of this Court. The husband, Maurice Weaver, remarried shortly after the hearing of the divorce case and has had another child or children by his second marriage.

We have carefully reviewed a record that runs in excess of three thousand pages, recording the testimony of more than forty witnesses. Suffice it to say that as is usually the case in proceedings of this kind, the record generates more heat than light upon the one real question that the trial court had before it for consideration. We likewise address ourselves only to a consideration of the one question for decision, and that is what is for the best interests of the unfortunate victim of the failure of the marriage of the parties to this cause, Max Weaver. He was less than four years of age when the parties separated, less than six when they commenced their war over his custody. Even now, we take judicial knowledge of the fact that he is not yet eleven.

From the record that has been made we can see that the parties were married in 1935, and had their first child in 1942 at the height of World War II, and when the departure of the father for military service was imminent. During the course of the marriage the father had under-

taken to establish himself in a law practice, with debatable success. He and his wife had lived in the household of his parents and she had sought to supplement his earnings by first teaching school, later assisting him in various abortive business enterprises, finally doing war work at a munitions plant, and later, during his absence in the service, returning to school teaching. The over-tones of the record make it manifest that the marriage prior to the husband's departure for the service had encountered at least the usual amount of trouble, if not more than this.

We cannot tell from this record the inducing cause of the wife's consulting with a Dr. Jacobson, who was serving in the Chattanooga area with the Navy as a psychiatrist during the war. The wife, in her testimony, says that her husband urged her to seek psychiatric consultation to resolve certain sexual difficulty, and there is some evidence to support this claim. On the other hand, it is the husband's theory that his wife met Jacobson perchance during his absence while Jacobson was carrying on some kind of consultation work with the school system in the community, and that an adulterous affair ensued. More than a hundred letters the wife received from Jacobson after his departure from Chattanooga in the spring of 1945, at a Post Office box rented by her in a fictitious name, have become a part of the record. Indeed, the discovery of these letters by the husband upon his return from the service served as the basis for the original proceeding for divorce. These letters are certainly capable of the construction that they referred to an adulterous affair, and the writing of them and their transmission through the mails to the wife, and retention by her, was an enormous indiscretion on both the part of Jacobson and Mrs. Weaver, to say the least. It is difficult to accept her theory that these letters were written as part of a

psychiatric treatment of her by Jacobson to the end of increasing her libido so that she might have a more satisfactory marital relationship with her husband. Needless to say, the existence of these letters and of the fact that Mrs. Weaver had lived much of her married life with her in-laws, in a community far from her childhood home and immediate relatives, placed her at a significant disadvantage when it came time to participate in a contested domestic relations proceeding. Much of the record that has been made here consists of testimony from partisans on behalf of the respective parties in support of their respective contentions that the other was and is an unfit person to have predominant or exclusive custody of the infant, Max Weaver. When one goes to the core of the case, one finds simply the letters received by Mrs. Weaver from Dr. Jacobson, combined with what seems to have been at best a tenuous marriage.

Whereas, the husband's petition to modify the original decree pertaining to custody was filed on April 23, 1948, the trial on the merits did not commence until December 13, 1948. In the interval there was the usual sparring of the pleadings, together with a motion that the Chancellor by Interchange recuse himself upon the ground that he had been of counsel for Mrs. Weaver, which he overruled and as to which we have a wayside bill of exceptions; further argument pro and con as to whether Mrs. Weaver, had been guilty of irregularity in not returning the child to the custody of the father on September 1, 1948, as by the original decree required; and further, the significance, if any, of the father's request and allowance of a continuance in August of 1948, on the ground of bad health. We consider these intervening events of litigation of insignificance when, as we have stated before, the sole question

before us, as it was before the trial court, is the best interests of the infant, Max Weaver.

The hearing on the merits consumed ten days, frequently going far into the evening, until January 5, 1949, at which time the trial court suspended the hearing for six months. In the meantime, there was further sparring among the parties, and finally, on October 10, 1949, the Court filed a written opinion. The Court came to the conclusion in its opinion that the mother is not a proper person for the child.

Motion for new trial was seasonably filed, setting forth some twenty-six grounds therefor, which was overruled on October 31, 1949. The bill of exceptions was approved on November 28, 1949, and the cause first reached this court by petition for writ of supersedeas presented to the Honorable Luke McAmis, one of the Judges of this Court, on December 30, 1949. In said petition it was charged that although the original decree provided for alternating custody of the infant, and that in the quarter September-December, 1949, the mother, Mrs. Weaver, had the child in her custody pursuant to the original decree, that nevertheless the trial court did on December 17, 1949, enter an order directing her to forthwith deliver the child to the father, Maurice M. Weaver, pending further orders of the Court of Appeals, or some judge thereof. A writ of supersedeas was granted and by consent of counsel, although the record was not then before the Court, argument was had on both the petition seeking the writ of supersedeas and the appeal on January 16, 1950. Thereafter, assignments of error and brief and additional assignments of error and supplemental brief were filed in behalf of the appellant. Appellee, however, was granted numerous extensions of time within which to file reply, and indeed, the record and the reply brief did not

reach the clerk until June 30, 1952. Thereafter appellee filed a supplemental reply brief on July 30, 1952.

We are not unaware that great weight should be given to the findings of fact of the Chancellor, for indeed, he had before him all of the numerous witnesses and had ample opportunity to observe their demeanor upon the witness stand. Nevertheless, we are constrained to say that this record amply demonstrates the unsuitability of adversary litigation as a vehicle for determining delicate family relationships. Critical though the trial court was of the demeanor of the mother in the course of this prolonged and agonizing experience, we see in her a prey at bay from those who seek to take her child from her. Granting, as we must do, that she was held in the original proceeding of divorce to have been the guilty party, nonetheless, the Chancellor who heard that cause did not find her so reprehensible as to be unfit to have her child, nor obviously did the father think of it at the time; otherwise, he would not have consented to the decree that went down. Certainly nothing transpired subsequently thereto to change the mother's character, unless it was the agonizing experience of having her child off and on with her every three-month period. Doubtless, many of her efforts to establish a basis for the retention of predominant or exclusive custody were ill-advised. We feel that her assault upon the Court itself was a grievous error, but we will not address ourselves to the wayside bill of exceptions as to do so would resolve the issue which we have placed before us. That a proceeding of this kind should be prolonged sixteen months is likewise unfortunate and undoubtedly overburdened the tolerance and patience of all those connected with it, either directly or indirectly, but that again must not be permitted to obscure the fact that we have

before us a child whose future is at stake. It appears now that he has been with his mother three years.

We cannot ignore the fact that the father, through his counsel, made repeated requests for extension of time within which to file reply brief in this cause, so that thereby a disposition of this case has been delayed nearly two and one-half years. This conclusion is inescapable, although the reasons offered by plaintiff's counsel for delay at the various times the repeated requests for extension were made were persuasive.

We likewise consider it unnecessary to determine whether the whole story of Mrs. Weaver's alleged misconduct was before the Chancellor in the original divorce hearing in 1946, as is contended in the plea of res judicata, made in her behalf.

As was said by our Supreme Court in the case of Holloway v. Bradley, 190 Tenn. 565, 571, 230 S. W. (2d) 1003, 1006:

"The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child."

A mother, except in extraordinary circumstances, should be with her child of tender years. The courts have repeatedly recognized this as a primary doctrine. 17 Am. Jur. 518; 41 L.R.A., N.S., 575, Note, Newburger v. Newburger, 10 Tenn. App. 555.

Normally, such a child will not be taken away from its mother unless it is demonstrated that to leave the child with its mother would jeopardize its welfare, both in a physical and in a moral sense. Supra.

Alternatively, the courts will allow the father some companionship with his child, and this is as it should be.

17 Am. Jur. 515; Grider v. Grider, 182 Tenn. 406, 187 S. W. (2d) 613; Hicks v. Hicks, 26 Tenn. App. 614, 176 S. W. (2d) 371.

Of course, the right of visitation by the father may be limited, or eliminated, if there is definite evidence that to permit him the right would jeopardize the child, in either a physical or moral sense. 17 Am. Jur. 515.

In this case we have a mother who obviously had, to say the least, an indiscreet correspondence. We also had a mother who appears not to have been able to undergo the agony of a custody hearing under circumstances in which she at least thought that the cards were stacked against her. We also have a mother who, in her eagerness to develop a legal basis to gain her case, obviously overreached herself. Do these considerations, however, sustain a finding that it would be deleterious to the welfare of her child, both physically and morally, to be under her dominion and control? We think not. We think this record falls short of establishing the unfitness of Mrs. Weaver as a mother.

Moreover, the evidence we find in the record, and it is so extensive that we deem it inexpedient to refer to particular testimony, is that the mother is and has been since the original divorce in 1946, a teacher, first in the schools of Knox County, and thereafter at her home in Morristown, and that she is held in high esteem there by the people, and has provided a suitable home for the child; this in contrast to the fact that with the father the child would be under the dominion and control of a stepmother who has had a child, or children, of her own. Again, the effect of taking the child away from the mother after it has been with her these three years, would not appear to be in the interest of the child.

Accordingly, the decree of the Chancellor will be over-ruled and the cause remanded to the Chancery Court for Hamilton County, with directions that there be entered a decree not inconsistent with this opinion, granting to Mrs. Weaver, the appellee, exclusive custody of Max Weaver, with the right of the father to visit his child at convenient times, and that the cause be retained on the docket for such further orders as may be necessary in the premises.

McAmis and Hale, JJ., concur.