**Karen Redmon RUYLE,**
**Plaintiff/Counter–Defendant/Appellee.**

v.

**Brian L. RUYLE, Defendant/Counter–**
**Plaintiff/Appellant.**

Court of Appeals of Tennessee,
Western Section, at Nashville.

Feb. 21, 1996.

Application for Permission to Appeal
Denied by Supreme Court
July 15, 1996.

Julia J. Tate, Gracey, Ruth, Howard, Tate & Sowell, Nashville, for Defendant/Counter–Plaintiff/Appellant.

J. Randall Hooper, Hooper & Hooper, Brentwood, for Plaintiff/Counter–Defendant/Appellee.

FARMER, Judge.

This appeal concerns the primary custody of Paul Alexander Ruyle, the minor son [1] of Appellee, Karen Redmon Ruyle ("Mother") and Appellant, Brian L. Ruyle ("Father"). The final divorce decree entered by the trial court awarded the parties joint custody, with Mother receiving primary physical possession.[2] The sole issue on appeal is whether the trial court committed error in its award of primary custody. For reasons hereinafter set forth, we affirm.

The following evidence was before the trial court for consideration: Mother and Father met at the University of Pittsburgh when he was a first year law student and she was in her final year of graduate school, studying Russian literature. They married July 25, 1988 after Father's completion of his second year of law school and Mother's obtainment of full time employment with the University.[3] Mother reasoned that she took "full time" employment anticipating that Father would "hav[e] to go on to school." Afterwards, Father continued his studies for two years— one year of graduate work in Russian studies and one year to complete law school. Father graduated law school in 1990. In October or November of that year, after passing the state bar exam, he began working as an attorney with a legal aid society earning approximately $18,000 annually.

Thereafter, Mother received an opportunity to work with the World Christian Broad-

---

1. Alex was 2½ years old at the time of trial.

2. The specific arrangement was for Father to have visitation on alternate weekends and every Wednesday with an "extended summer physical possession" from June through July, during which time Mother would have visitation on alternate weekends and every Wednesday.

3. Mother did not complete her graduate studies.

casting Corporation in Nashville as a Russian translator. Mother was born and raised in Davidson County and she has extended family currently living in the Nashville area. The new position represented an increase in pay of approximately $5,000 for Mother. Father was receptive to the move despite the knowledge that he would be required to take another bar exam in order to practice law in Tennessee. Mother moved to Tennessee in June 1991, with Father following in October of that year. In September 1991, Mother learned of her pregnancy with Alex. After relocating, Father studied for and passed the Tennessee Bar Examination in May 1992. During this time, Mother supported the family financially.

Mother described this time of the marriage as follows:

> [Father] stayed home most of the time. I guess I thought he was interviewing or at least looking for jobs. I know that he did ... some job searching. Mostly from what I could tell he kept up with sports, news and figured out his baseball trades, which is his favorite thing.

Alex was born May 31, 1992. Mother worked until the day before his birth and returned after one month. After returning to work, Mother was informed that her services as a Russian translator were no longer needed due to some changes within the business. She agreed, however, to continue with the company in the position of bookkeeper with the same salary of $20,000 annually. Father remained unemployed and took care of the child during the days. He also did the laundry, loaded the dishwasher and ran family errands. Mother was responsible for the remaining house cleaning chores. They shared child care responsibilities in the evenings and on weekends. Father complained that Mother's new position at work involved extra hours for which she received no additional compensation. He believed that this "extra time" should have been directed toward Alex. Mother complained that during the marriage, Father did not "want to adhere to any kind of specific schedule for Alex" and "really wanted Alex to set the schedule for [them]."

Mother testified that during the marriage, the parties argued over money with her telling Father that "he needed to get a job, that [they] were in the hole and that [they] were going to be further in the hole." Mother continued:

> Things kept getting tighter for us. All the bills from the hospital came in and stuff like that. We were beginning to spend money mostly on our living expenses, but even things like diapers and formula and thinks [sic] like that had to—and gasoline we were having to charge to our credit card, which was already at the maximum.
>
> ....
>
> ... he had loans that were coming due and were going to have to be paid. We had other expenses, plus anything unforeseen. We had no savings, no money to even meet the end of month.

Mother's father provided additional financial assistance throughout the marriage.

Father testified that he spent the entire first year of Alex's life with him, "seven days a week." During this time, Father "was not offered anything" in the way of work, although he applied for various positions including some outside the legal profession. Mother testified that Father applied "at one restaurant." Mother knew of no other job offers to her husband in the legal field other than that of Ms. Rose, an immigration lawyer. Mother's father attempted to assist Father in finding employment by contacting persons in state government.

In October 1992, Father began doing some pro bono work for Ms. Rose. He started working "for real" as an independent contractor with her in April 1993. He worked from the home, continuing to care for Alex during the day. Father stated, "I was doing this work primarily at home and working around Alex's schedule as best I could not trying to take time away from being with my child but to do the work." In June 1993, Father began working two afternoons per week at the office and Alex was placed in day-care at Stonebrook on these days. Around this same time, Father also began working part-time for the local YMCA as a swimming instructor. According to Mother, during his "free time," Father continued his

"baseball trades" and watched ESPN. Mother and Father separated in December 1993, but continued to share responsibilities for the care of Alex.

Mother currently resides in a two bedroom apartment. Father rents the upstairs of a home belonging to friends. Father now works three days a week outside the home as a staff attorney for Ms. Rose, earning $30 an hour. His income in 1993 was $4,600 and $14,000 in 1994. Father testified that he owes approximately $30,000 in student loans. Father stated that he believes he can earn $20,000 annually if working full-time for Ms. Rose. His plans are to begin working four days a week "fairly soon." Both parties testified that when either has physical custody of Alex, he is placed in day-care at Stonebrook during their working hours.[4] At the time of trial, Father was 32 years old and Mother, 33.

Both Mother and Father agree that Alex is a well adjusted child and does well at Stonebrook. They also agree that it is in Alex's best interests to have a good relationship with both of his parents. As to his philosophy on child rearing, Father testified:

I think all the people I ever talked to who are in child care or teaching say you can tell the children who have spent time at home with their parents. You can tell the ones who have been there and feel the security and feel that they are the priority in their parents' lives.

. . . . .

... I believe in that, and I've lived my life according to that belief. I have tried very hard to work my schedule around being able to spend time with him. I think one of the nice things about working with [Ms.] Rose is that she has been very supportive of that.

She has been giving me jobs and she has given me just about every bit of work that she can, but she was also very understanding about me wanting to work part time and wanting to stay home with my child, and we've done a pretty good job of allowing me to make my child a priority.

After hearing the evidence, the trial judge ruled from the bench as follows:

[I]t's obvious that both of these parties are fit persons for this Court to consider as custodian of this child....

... what concerns me is that an adult says that he's going to operate his business schedule around a child's schedule. Now, granted parents have to stay with their child, but you can't forego your career and ability to support the child just to make sure you spend every minute with the child. That does not make good sense. It does not set well with this Court.

... you do have an obligation at 32 to get set in your career and do the best you can to provide for your child. And I feel that Mr. Ruyle is definitely underemployed here by his own voluntary acts,....

. . . .

Insofar as the custody, ... the Court feels that Mr. Ruyle's expectations are unrealistic. Therefore, the Court is making the statement that this—my decision I feel based on the evidence is to the best interest of this child that custody of this child be vested jointly. Physical possession will be with the mother.

■ We review this case in accord with Rule 13(d) T.R.A.P. which mandates a *de novo* review accompanied by a presumption of correctness of the trial court's findings of fact, unless a preponderance of the evidence is otherwise. *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn.1984). Our paramount concern is the welfare and best interests of Alex Ruyle. *See, e.g., Koch v. Koch,* 874 S.W.2d 571, 575 (Tenn.App.1993). We note that Father does not dispute the award of joint custody, but only questions the trial court's award of primary custody to Mother. Father argues that "[t]his is a case which confronts the application of the remnants of the 'tender years doctrine' where the primary caretaker of a child is his father rather than his mother." Father asserts that the trial court subjectively applied its own ideas regarding the appropriate roles for mothers

---

4. An interim order by the trial court granted joint physical custody of Alex to the parties in thirty (30) day intervals.

and fathers and that the judgment, which clearly reflects such "gender stereotyping," should not be allowed. Father urges this court to apply the remnants of the doctrine in a "gender—neutral manner. . . ."

Originally, courts applied the tender years doctrine to require an award of custody to the mother of a child of tender years, except in extraordinary circumstances. *See Weaver v. Weaver*, 37 Tenn.App. 195, 261 S.W.2d 145 (1953). In 1983, the court in *Bah v. Bah*, 668 S.W.2d 663 (Tenn.App.1983), refused to rigidly adhere to the rule and identified it as "one of many factors to be considered in determining custody. . . ." *Bah*, 668 S.W.2d at 666. Finally, in 1987, the legislature addressed the doctrine in T.C.A. § 36–6–101(d), stating:

> It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption in favor or against the award of custody to such party; provided, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

■ It is clear that the tender years doctrine is but one of many factors to consider when determining custody. The court in *Bah* identified other relevant factors to include the age, habits and mental and emotional makeup of the child and the parents seeking custody; the education and experience of the parents; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody; the availability and extent of third-party support; the associations and influences to which the child will most likely be exposed; and where there exists the greater likelihood of an environment of love, warmth, stability, support, consistency, care, concern and physical and spiritual nurture. *Bah*, 668 S.W.2d at 666.[5]

■ In consideration of the foregoing, as well as all other relevant factors, courts are to utilize a "comparative fitness" approach and determine which of two or more available custodians is more or less fit than others. *Id.* The trial court found both parties fit to have custody of Alex. The record clearly evinces both parents' love for their child and the fact that both have made sacrifices, albeit different ones, for him. We cannot agree, however, that the trial court misapplied or overemphasized the tender years doctrine in reaching its decision. Certainly, a father is just as capable as a mother to remain at home and care for their child. In fact, most mothers who desire to continue working or advance their careers would welcome such an opportunity. Better yet, in an ideal world, both parents would have the opportunity to remain at home and raise their child to provide as much love, attention and support as possible during the early stages of a child's development. The reality is, however, that most parents are not afforded this luxury. Most often times today both parents find it necessary to work outside the home in order to make ends meet, prompting, in many instances, the need for outside support such as day-care.

In this case, Mother earns approximately $20,000 per year—hardly sufficient to justify Father's unemployment or under-employment. We certainly appreciate Father's desire to be at home with his young child and if the parties' financial situation had been different, such could not properly be questioned. Curiously, the record does not indicate that Father worked any additional hours during the thirty day intervals of the trial court's temporary custody order, when he had far less parenting responsibilities. Mother's point in this regard is well taken.

Based on the evidence before us, we do not view the trial court's decision as an improper commentary on the appropriate behavior for mothers and fathers in today's society. Instead, we find the court's decision well grounded in the realism that Mother's income alone proved insufficient to support this family. This is evident by the fact that additional financial support was sought from the child's maternal grandfather. Father's part-time employ, although certainly helpful, does not appear to have solved their financial

---

5. These factors are now codified at T.C.A. § 36–6–106.

difficulties. It is one thing to sacrifice the pursuit of one's career for the benefit of your child but yet quite another to prolong seeking full-time or adequate employment to remain at home with the child when the result is detrimental to the family and its needs as a whole.

Father cites two unpublished decisions from this jurisdiction wherein the father in each case was awarded custody of their child of "tender years." [6] In each case, the facts establish that the father assumed the primary role of caregiver. Both opinions also reflect upon the negative behaviors of the mothers toward their children, from verbal abuse and neglect to prioritizing one's work over the needs and care of the child. Neither of these cases are analogous to the facts presently before us. Here, both parents have been determined fit. Father, indeed, supports Mother's relationship with her son. The fact that Mother has maintained full-time employment since her son's birth in no way indicates to this Court that she does not consider her son her first priority. In fact, we find the contrary to be true.

We are satisfied that the welfare and best interests of Alex Ruyle are served by an award of primary custody to Mother. The judgment of the trial court is therefore affirmed and this cause remanded to the trial court for any further proceedings herewith consistent. Costs are taxed to Brian L. Ruyle, for which execution may issue if necessary.

HIGHERS, J., and WILLIAMS, Special Judge, concur.

---

6. *Pierce v. Pierce,* No. 95, 1987 WL 9170 (Tenn. App. April 10, 1987); *Gambill v. Gambill,* No. 88–106–II, 1988 WL 97026 (Tenn.App. Sept. 21, 1988).