# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**FILED**

**April 28, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **WILLIAM THOMAS WINCHESTER,** | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Chester Circuit No. 4186 |
| | ) | |
| **v.** | ) | |
| | ) | Appeal No. 02A01-9802-CV-00046 |
| **GLENDA RACHELLE WINCHESTER** | ) | |
| **(COLLIER),** | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

APPEAL FROM THE CIRCUIT COURT OF CHESTER COUNTY
AT HENDERSON, TENNESSEE

THE HONORABLE WHIT LAFON, JUDGE

For the Plaintiff/Appellant:        For the Defendant/Appellee:

William T. Winchester, Pro Se        C. David Jones
Memphis, Tennessee                   Huntingdon, Tennessee

**AFFIRMED IN PART, REVERSED**
**IN PART AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is the second appeal in this child custody case. In the first trial, the trial court awarded the parties joint custody of their minor child. Both parties appealed, each arguing for sole custody. This Court reversed the award of joint custody and remanded the case to the trial court for an award of sole custody to either the mother or father. On remand, the trial court awarded sole custody to the mother, and ordered the father to pay child support. The father now appeals the custody award to the mother and the award of child support. We affirm the award of custody, reverse the award of child support and remand for recalculation of child support.

Since the trial court on remand considered the proceedings in the first trial, we must review the evidence in the first trial as well as the proceedings on remand. Glenda Rachelle Winchester Collier ("Mother") and William Thomas Winchester ("Father") were married on February 14, 1994. They separated before the birth of their daughter Maggie, born on October 24, 1994. Both parties sought sole custody of Maggie. Prior to the first trial, the trial court appointed a guardian ad litem for Maggie to aid in the custody determination. The trial court also ordered a psychological evaluation of Mother by Dr. Elias King Bond, to determine her fitness as a parent. Prior to trial, Father was evaluated by Dr. Lynn Zager.

At the first trial, Father was represented by counsel and Mother was not. Father testified, and presented evidence and several witnesses and cross-examined Mother. Mother testified but did not cross-examine Father or present evidence or witnesses on her behalf. Throughout all of these proceedings, the relationship between the parties has been consistently acrimonious.

At the first trial, Father complained of Mother's failure to convey medical information to him about Maggie's health, asserting that Mother did not inform him when the child was hospitalized for three days and that, on another occasion, Mother failed to inform him that Maggie had some medicine in her bag that needed to be refrigerated. Father testified that although Maggie had asthma and several doctors have prohibited her exposure to smoke, Mother continued to smoke around Maggie, worsening Maggie's respiratory ailments. Several medical records were introduced diagnosing Maggie's asthma and including physicians' admonitions against Maggie's exposure to smoke.

In the first trial, Father argued that Mother had an unstable employment record, holding nine jobs in the three year period before trial. He asserted that Mother let her second oldest child overdose on medicine while the child was sitting in Mother's lap in the hospital emergency room.

He also maintained that Mother had sexual relations with her boyfriend while Maggie was in the home, in violation of the trial court's orders. Father characterized Mother as untruthful, asserting that she listed three children on her public housing application when only two children lived with her, and that she made contradictory statements about her smoking habits. Father testified that Mother had a history of obstructing visitation with her children's fathers. He stated that sometimes when he would pick up Maggie for visitation there would be a note on the door with directions to a babysitter's house where Maggie was staying at the time.

The psychologist who had evaluated Father, Dr. Lynn Zager, testified that he was free of significant mental illness and concluded that he would be a fit parent. Father's sister and aunt testified about the loving relationship between Maggie and Father and of Father's extensive family support. Father testified about his love for Maggie and his involvement in her daily activities. He emphasized the court-ordered psychological examination of Mother, which indicated a histrionic personality disorder, with passive-aggressive and dependent features.

At the first trial, Mother testified that, when she was pregnant with the parties' child, Father dragged her down the stairs by her feet. Father denied this. Mother asserted that Father repeatedly threw her out of the house, verbally abused her, and threatened her with physical abuse. Mother also accused Father of stalking her after they separated. Mother filed a police report indicating that Father repeatedly drove by her home. Father admitted to conducting surveillance on Mother and hiring a private detective to gather more information. Mother denied smoking around Maggie or allowing her boyfriend to spend the night while Maggie was present.

The Guardian Ad Litem's report prepared for the first trial recommended that the parties have joint custody in decisions regarding Maggie, but that Mother have principle physical custody, with liberal visitation to Father. The Guardian Ad Litem stated:

> From what I have observed, the natural mother is somewhat immature and does not appear to understand the importance of her actions as they affect her position with the Court in regard to the custody issue pending. On the other hand, William Winchester is very intense and all consumed with this case and has left no stone unturned.

Joint physical custody was not recommended because of the animosity between the parties. The Guardian found the public housing that Mother lived in to be "adequate for the children and Ms. Winchester." The Guardian also considered Dr. Bond's psychological evaluation of Mother. Although Dr. Bond's report stated that Mother "could very well have a personality disorder," he

2

concluded that "[b]ased on these interviews and the information that I have at hand, I do not see sufficient reason to consider her unfit or incapable or retaining custody of their child, as it presently remains."

After the first trial, the trial court awarded the parties joint custody of Maggie, ordering that she spend alternate weeks with each parent. Both Father and Mother appealed to this Court. On appeal, both parties agreed that the trial court erred in awarding joint custody of Maggie to both parents. Each sought sole custody.

On appeal, this Court concluded that the trial court erred in awarding the parties joint custody of Maggie, in view of the animosity between the parents. We found that the record did not contain sufficient information for the appellate court to make an award of sole custody and remanded the case to the trial court for further findings of fact regarding custody and for an award of sole custody to either Mother or Father, with reasonable visitation to the noncustodial parent.

Prior to the second trial, Father attempted to suppress the Guardian Ad Litem's report that was prepared for the first trial, stating that it contained inaccuracies and incorrectly relied on the tender years doctrine. This motion was denied. Father also filed a motion to recuse and change venue. The recusal motion alleged that the trial court infringed Father's First Amendment right of free speech and had an alleged conflict of interest with the guardian ad litem from the first trial. The motion explained that the conflict was because "the Guardian Ad Litem has a working relationship with the Juvenile Court, has tried Juvenile Court cases, and thus has a professional interest with all trial courts in this judicial district." Father also reported the trial court judge to the disciplinary board. The trial court denied Father's motion to recuse and change venue.

In the second trial, the trial court limited the testimony and proof to those incidents that occurred after the first trial, over Father's objection. The trial court stated that it would consider the record in the first trial regarding incidents prior to the parties' divorce.

In the second trial, Father testified that, on one occasion after the initial custody award, Mother refused to let him visit with the child for scheduled visitation. He also alleged that on one

occasion Mother failed to show up at a designated time and place to exchange the child for visitation; there was conflicting testimony as to when this occurred.

Father also claimed that Mother's lack of stability in her personal life affects the child. For example, Father noted that Mother had held at least four jobs since the first trial, that Mother obtained her current job just one month before trial, after working only one month at her previous job, that Mother lived in a public housing project, that Mother did not have custody of one of her other children by a different father, and that Mother had bounced several checks. He alleged several instances of perjury by Mother, such as her denial of ever smoking around Maggie, her denial of losing custody of her eldest child, and her denial that she had lived on Windsor Street in Memphis.

In his testimony, Father emphasized family support from his parents, sister, and aunts. He noted his apartment in Memphis with a pond and other amenities for Maggie, and his access to the University of Memphis Day Care Center, which he asserted has excellent educational programs. Father also pointed out his advanced education: a bachelor's degree in physics and a master's degree in education. Father testified that he was attending law school. Father also stated that he regularly attends church and has had Maggie baptized.

At the second trial, Mother introduced evidence indicating that Father has had several encounters with the local police department. An investigator with the Huntingdon Police Department, Steve McClure ("McClure"), testified that he had a confrontation with Father when Mother failed to show up for a custody exchange. McClure stated that Father came into city hall ranting and raving because his ex-wife failed to meet him for a custody exchange. McClure stated that he probably would have arrested Father if his mother had not been accompanying him. Father had another confrontation with the Huntingdon Police when they were called at a different custody exchange. Father stated that a police officer approached him and asked Father if he was wearing his body microphone. When Father answered in the affirmative, the officer allegedly grabbed the microphone out of Father's jacket. Father wrote a letter to the police department demanding a formal apology. In that letter, Father stated that he had a legal right to be at Wife's home and to tape record the events and that "I have tape recorded every encounter with my ex-wife over the past year in order to protect myself from her lies."

In a letter to the Director of Public Safety of Huntingdon, Father accused the police department of staking out his apartment and following him on several occasions. He threatened that "any further harrassment [sic] by any member of your department will result in civil litigation and federal intervention; as a disabled federal officer, I guarantee it."

Mother testified at the second trial as well. She denied that she smoked around Maggie or that she exposed her to smoky environments. Mother denied that Maggie has asthma. Mother also denied that her boyfriend stayed the night at her home or that they had engaged in sexual activities while Maggie was in the house. Mother testified that Father had continually harassed her by driving by her family members' houses, taking photographs and videotapes of Mother and her relatives, and taping phone conversations with her without her knowledge. Lori Cole, Mother's cousin and Maggie's former babysitter, filed a complaint with the local police department alleging that Father was stalking and videotaping her and her husband. In response, Father filed a lawsuit against the Coles for defamation, slander, and filing a false police report. In her testimony, Mother noted that Father's lawsuit was dismissed with a warning of Rule 11 sanctions. Mother also maintained that Father perjured himself in his lawsuit against the Guardian Ad Litem by claiming indigency when Father owned a $50,000 house on which he was receiving rental payments.

Mother testified that she had a stable job that paid $408 a week, had recently purchased a reliable automobile, was in the process of buying a house, and had the full support of her family, including her mother, who cared for Maggie while Mother was at work. Mother observed that Maggie's older half-sister loves and misses Maggie when she is gone and asserted that it would not be in Maggie's best interest to separate her from her older sister.

Prior to the first trial, Father paid $200 per month in child support. Neither party paid child support during the two year period in which the parties exercised joint custody. Father is now a full time law student who receives $20,000 per year in student loans and $440 per month in rental income on his house. At the first trial, Father was receiving $454 per month in Veteran's Disability payments. There was no evidence presented at the second trial indicating that he no longer received the disability payments.

After the second trial, the trial court issued an order, stating in pertinent part:

> Visitation privileges set out by Chancellor Morris have reasonably been complied with by both parties and the families of both parties have been and are very supportive of each party.

5

The Court finds there is still friction between the parties. The proof shows that [Father] has secretly taped conversations between the parties and has taken pictures from a distance, all of which is annoying to the other party. The Court finds that [Father] did complain that [Mother] smoked in the presence of the minor child, which complaint is denied by [Mother].

The Court finds that the Defendant, Glenda Rachelle Winchester (Collier), is employed with Proctor and Gamble at an annual salary of $24,000.00 and is purchasing a house that will be adequate for her and her two minor children

The Court finds that the Plaintiff, William Thomas Winchester, lives in an apartment in Memphis that is adequate for him and his minor daughter.

The Court finds that each party has adequate back-up in their care of their minor child, Maggie.

The Court finds that [Mother] is the mother of another daughter born to her in a prior marriage who is approximately two years older than the minor child of the parties.

The Court finds that said sisters are very close and have lived together more or less since Maggie was born.

10. The Court finds that it would be in the best interests of the minor child, Maggie, that she be placed in the custody of the Defendant Glenda Rachelle Winchester (Collier), with right of liberal visitation to Plaintiff William Thomas Winchester.

IT IS, THEREFORE, ORDERED, by the Court that:

1. Custody of the minor child shall be placed with the Defendant, Glenda Rachelle Winchester (Collier), with the right of reasonable visitation granted to the Plaintiff, William Thomas Winchester.

2. Plaintiff, William Thomas Winchester shall pay the sum of $300.00 per month as child support, plus Clerk's fees, through the Clerk's office. Payment shall be made in bi-monthly payments on the 1st and 15th of each month.

From this order, Father now appeals.

On appeal, Father argues that it was error for the trial court to prohibit him from arguing or testifying about facts introduced at the first trial or which happened before the divorce was granted. Father contends that this had the effect of preventing him from impeaching Mother's testimony that she did not smoke around the child. Father contends that the trial court failed to conduct a comparative fitness analysis. Father also argues that it was error for the trial court to consider the Guardian Ad Litem's report despite its inaccuracies and its reliance on the tender years doctrine. Father maintains that the evidence preponderates against the trial court's award of custody to Mother. Father also contends that the trial court's determination of child support was arbitrary and inappropriate because the trial court did not hear any evidence on Father's income. Finally, Father argues that the trial judge erred and abused his discretion by failing to recuse himself and forcing Father to reveal facts concerning his complaint against the trial judge.

In child custody cases, appellate review is *de novo* upon the record with a presumption of the correctness of the trial court's findings of fact. *See* Tenn. R. App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. App.

6

1993). Of course, the child's best interest is the primary consideration in custody cases. *See Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. App. 1983). A comparative fitness analysis is used to decide which parent should be awarded custody. *See Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996).

The first issue for our consideration is whether the trial court erred in limiting Father's testimony and proof to those incidents that occurred after the parties' divorce was final. The trial court repeatedly quoted the appellate court's instruction that the case was remanded for *further* findings of fact. *See Winchester*, 1997 WL 61508, at *4. The trial court stated:

> [T]he Court of Appeals has used the term, "conduct further findings and facts." So, anything new--and if this is not new, why then there is no necessity--I'm asking you--not asking you, but I am advising you, that you have the right to introduce any new facts. And, that's what I'm concerned with. I'm not concerned, as such, about the divorce. What I'm concerned with is to develop further facts, which would then be submitted to my recommendation to the Court of Appeals.

The trial court stated further:

> What you want to do is argue--I've read three or four times, what the Court of Appeals has instructed. And, I've asked that you stay with it. Now, one more time. This is it. Remand the court, the trial court, to conduct further findings of fact, concerning each party's comparative fitness. Now, when you say further, you mean something new. What's old is in this record.

Although the trial court limited the parties from introducing evidence that was already in the record, the trial court explained that it would review and consider the record of the first trial. The trial court stated, "Just what's happened, now, since the legal record, as far as I'm concerned, because I have those and I'm going to read what was said and make a consideration." On direct examination, when Father attempted to question Mother about the contempt petitions that he filed in the first trial, the trial court responded, "I'll read the record on that; you don't need to reintroduce it."

The trial court is afforded wide discretion in the admission or rejection of evidence, and its actions will be reversed on appeal only where there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. App. 1995). The trial court's statements indicate clearly that the trial judge considered in its decision information contained in the record from the first trial. At the first trial, Father had full opportunity to develop any facts or evidence. We find no abuse of discretion in the

7

trial court's decision to refuse to hear testimony about events already reflected in the record. The trial court's decision on this issue is affirmed.

Father's next issue on appeal is that the trial court failed to compare the fitness of the parties but, instead, improperly applied the abolished tender years doctrine by requiring Father to prove that Mother was unfit. The tender years doctrine was originally established in *Weaver v. Weaver*, 37 Tenn. App. 195, 261 S.W.2d 145 (1953). The court held in that case, "A mother, except in extraordinary circumstances, should be with her child of tender years. . . . Normally, such a child will not be taken away from its mother unless it is demonstrated that to leave the child with its mother would jeopardize its welfare, both in a physical and in a moral sense." *Id.* at 202, 261 S.W.2d at 148. When the comparative fitness doctrine was adopted in *Bah v. Bah*, 668 S.W.2d 663, 667 (Tenn. App. 1983), the tender years doctrine became only a factor in the analysis. The *Bah* court stated that,

> To the extent the "tender years" doctrine has continued efficacy it is simply one of many factors to be considered in determining custody. . . . [I]t is not necessary to find that a mother is unfit in order to award custody of a minor child to the father, or for that matter another third party when it is in the child's best interests.

*Id.* at 666-67. In 1997, the state legislature amended Tennessee Code Annotated § 36-6-101(d) to state that "It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party." Tenn. Code Ann. § 36-6-101(d) (Supp. 1998).[1]

Father lists several instances in which he asserts that the trial court stated that the issue before it was whether Mother was fit or unfit. For example, the trial judge told Father, "[W]e're talking here whether she's a fit mother or not." Father also notes the trial court's admonition that Father was to introduce proof showing that "since the divorce was granted, that this woman has been an unfit mother or a fit mother." Father fails to note the trial court's statement that "the question is, is her

---

[1] This section previously read:

> (d)    It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption in favor or against the award of custody to such party; provided, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

Tenn. Code Ann. § 36-6-101(d) (1996).

ability to be a proper parent, and yours, too." At another point, the trial court asked Father why it should award custody to him rather than to Mother. Father points to no statement in the record indicating the trial court's award of custody to Mother was based on its gender preference. Moreover, the custody order indicates clearly that the trial court performed an appropriate comparative fitness evaluation of the parties:

> Visitation privileges set out by Chancellor Morris have reasonably been complied with by both parties and the families of both parties have been and are very supportive of each party.
> The Court finds there is still friction between the parties. The proof shows that [Father] has secretly taped conversations between the parties and has taken pictures from a distance, all of which is annoying to the other party. The Court finds that [Father] did complain that [Mother] smoked in the presence of the minor child, which complaint is denied by [Mother].
> The Court finds that [Mother] is employed with Proctor and Gamble at an annual salary of $24,000.00 and is purchasing a house that will be adequate for her and her two minor children.
> The Court finds that [Father] lives in an apartment in Memphis that is adequate for him and his minor daughter.
> The Court finds that each party has adequate back-up in their care of their minor child, Maggie.
> The Court finds that [Mother] is the mother of another daughter born to her in a prior marriage who is approximately two years older than the minor child of parties.
> The Court finds that said sisters are very close and have lived together more or less since Maggie was born.
> The Court finds that it would be in the best interests of the minor child, Maggie, that she be placed in the custody of [Mother] with right of liberal visitation to [Father].

While the trial court did not discuss separately each factor listed in Tennessee Code Annotated § 36-6-106, from the record and the final order, it is clear that the trial judge conducted an appropriate comparative fitness analysis. We find this issue on appeal is without merit.

Father also argues that the Guardian Ad Litem's report was erroneously utilized by the trial court because it relied upon the tender years doctrine. However, on the topic of the tender years doctrine, the Report states:

> The Tennessee Courts have historically recognized the "tender years doctrine" since the case of *Weaver v. Weaver*, 261 S.W.2d 145 (Tenn. App. 1953), in which the Court ruled "a mother, except in extraordinary circumstances, should be with her child of tender years."
> This has been the case until recently in which the Court has found that in the case of *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983) "that the tender years doctrine is only a factor to be considered in the overall determination in what is in the best interest of the child." It appears that the Courts are moving toward a more modern approach to the custody issue in finding that the best interest of the child is the paramount issue with tender years being a factor along with the warmth, consistence, and continuity of the relationship between parent and child and not the sex of the parent. *Edwards v. Edwards*, 501 S.W.2d 283 (Tenn. App. 1973).

As noted above, the custody order by the trial court does not indicate that the trial judge relied on the tender years doctrine. We find no abuse of discretion by the trial court in utilizing the Guardian Ad Litem's report in its decision on custody.

Father contends on appeal that the evidence preponderated against the trial court's decision to award custody to Mother, based on a comparative fitness analysis. He argues that Mother is emotionally unstable and has an unsettled lifestyle, changing employment frequently. He maintains that Mother obstructed his visitation with Maggie, and that she smokes in Maggie's presence and denies that Maggie has asthma. Father notes that Mother lives in a public housing project, while he lives in an family-oriented apartment complex in Memphis while attending school, and points out that he is highly educated. Father notes that Mother has three children, and that her mother has custody of her oldest daughter. He alleges incidents indicating dishonesty, such as an arrest for writing bad checks and lack of truthfulness in responding to discovery inquiries about subjects such as drug use, prior marriages, smoking around the parties' child, and overdosing another child with medication.

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *see also In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). This is especially true for custody decisions, which are factually driven and require the careful consideration of numerous factors. *See Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. App. 1997) (citing *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn. App. 1988); *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950)). "Since [child custody] decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility." *Adelsperger*, 970 S.W.2d at 485 (citing *Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. App. 1988)).

Some of the facts involved in comparing the fitness of the parents in this case are either undisputed or do not depend on a credibility determination. It is undisputed that Maggie loves both parents and has emotional ties to both. Both parents have living arrangements that are suitable for raising Maggie. Mother's multiple marriages are undisputed, as is the fact that Mother's mother retains custody of her oldest daughter. Without question Father is highly educated. It is undisputed that Mother is employed and Father is not, while he is in school  All of these facts are relevant to the custody determination and do not involve a credibility determination by the trial court.

However, a number of facts are disputed and require the trial court to assess the demeanor and credibility of the parties and the witnesses. Father insists that Mother and her boyfriend smoke in Maggie's presence, which would exacerbate Maggie's respiratory conditions. Mother denies this. Mother alleges that Father dragged her down the stairs by her feet while she was pregnant, and that he was controlling and verbally abusive. Father denies this. Father alleges that Mother and her boyfriend slept together while Maggie was in her home, which Mother denies.

The parties' temperaments and emotional characteristics have been described by witnesses. The psychiatrist who evaluated Mother, Dr. Elias King Bond, described Mother as possibly having "a personality disorder, probably best characterized as a mixed diagnostic picture, with histrionic and passive/aggressive and dependent features." However, he did not find her to be an unfit parent. Based on his evaluation, as well as his conversations with Father, he stated that he saw no reason not to continue the arrangement whereby Mother retained custody of Maggie and Father continued to have reasonable visitation.

The Guardian Ad Litem described Mother as intelligent and noted her efforts to improve herself  by completing her education to get a job to support herself and her children. She also described Mother as "somewhat immature" and observed that she did not seem "to understand the importance of her actions as they affect her position . . . in regard to the custody issue . . . ." The observations regarding Mother are corroborated by the undisputed facts of her multiple marriages and the loss of custody of her oldest daughter.

The psychiatrist who examined Father, Dr. Lynn Zager, described him as "sensitive" and "caring" and "free of any significant or severe mental illness." The Guardian Ad Litem stated that Father was concerned for his daughter "almost to the point of obsession." She described Father as "very intense and all consumed with this case and has left no stone unturned." Mother described

11

Father as "controlling" and testified that he had followed her, had conducted surveillance on her home and on her friends and family members, had taped telephone conversations with her and members of her family, and taken photographs of Mother and her friends and family. Father acknowledges much of this behavior, and it is corroborated by police reports. Father was described by a police detective as "very very combative."

Thus, in this case, there are a number of disputed facts requiring the trial court to determine credibility. In addition, the facts regarding the parties' temperaments and emotional characteristics, crucial to a custody determination, must be determined by the trial court in view of the parties' demeanor in the courtroom and their conduct during the course of the litigation:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions.

*Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. App. 1996).

In addition, the trial court relied on the fact that Maggie and her half-sisters "are very close and have lived together more or less since Maggie was born." While living with Mother, Maggie's maternal grandmother cares for Maggie and her older sisters, providing an opportunity for all three sisters to spend time together. The Guardian Ad Litem described Mother's mother as "a very concerned grandmother who appears to want the very best for her granddaughter." Father does not dispute this. "Generally speaking, siblings, following a divorce, have a right to spend their minority together in the absence of proof of potential harm to one of them or other extenuating circumstances." *Gracey v. Gracey*, No. 03A01-9511-CV-00419, 1996 Tenn. App. LEXIS 240, at *7 (1996). Clearly it was appropriate for the trial court to take into account the benefits to Maggie of maintaining her relationship with her sisters.

Both parents in this case love Maggie and have significant strengths and weaknesses. Viewing the record as a whole and deferring to the trial court's ability to assess the credibility and demeanor of the witnesses, we cannot say that the evidence preponderates against the trial court's decision to award custody of Maggie to Mother. The award of custody to Mother is affirmed.

Father also argues on appeal that the trial court's award of child support was arbitrary because the trial court did not hear any evidence on Father's income and failed to make a written finding justifying deviation from the child support guidelines. Mother contends that because Father basically has no income, the trial court set child support at a reasonable amount.

12

Our review of a child support order is *de novo* on the record. The trial court's factual findings are presumed correct, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). No presumption of correctness attaches to the trial court's conclusions of law. **See Carvell v. Bottoms**, 900 S.W.2d 23, 26 (Tenn. 1995).

The record before us clearly reflects Father's income at the time of trial consisting of $440 per month in rental income and $20,000 per year in student loans. Father apparently continues to receive the $454 per month in Veteran's Disability Payments that he was receiving at the first trial. While the trial court did not expressly state the income on which he based the award of child support, the record reflects that the court clearly heard evidence about Father's loan and rental income. Father did not dispute this income at trial.

We must first determine whether Father's student loans are considered income for purposes of determining child support. Tennessee's child support guidelines broadly define gross income:

> Gross income shall include all income from any source (before taxes and other deductions), whether earned or unearned, and includes but is not limited to, the following: wages, salaries, commissions, bonuses, overtime payments, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, benefits received from the Social Security Administration, i.e., Title II Social Security benefits, workers compensation benefits whether temporary or permanent, judgments recovered for personal injuries, unemployment insurance benefits, gifts, prizes, lottery winnings, alimony or maintenance, and income from self-employment.

*See* Tenn. Comp. R. & Regs. Rule 1240-2-4-.03(3)(a) (1994). Student loans are not included in the definition, nor is their status addressed in any Tennessee case law. Therefore, caselaw from other jurisdictions must be considered. The California Court of Appeals held that educational loan proceeds, including amounts over that required for books and tuition, are not income under the state's Family Code definition of income, which is similar to the Tennessee definition.[2] **See Rocha v. Rocha**, 80 Cal. Rptr. 2d 376, 377 (Cal. Ct. App. 1998). The **Rocha** court reasoned that student loans, with an expectation of repayment, differed substantively from the sources of income listed in

---

[2]     The California Family Code defines income for child support purposes as:

(a) The annual gross income of each parent means income from whatever source derived . . . and includes, but is not limited to, the following:
(1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article.

*Rocha*, 80 Cal. Rptr. 2d at 376-77 (quoting Cal. Fam. Code § 4058).

the code definition that had "no expectation of repayment or reimbursement." *Id.* Several other jurisdictions have also held that educational loans are not income for child support purposes. In *In re Marriage of Syverson*, 931 P.2d 691, 698 (Mont. 1997), the Supreme Court of Montana found that educational loans that must be repaid are not considered income for child support purposes, but educational loans that need not be repaid are income if they are intended to subsidize the borrower's living expenses. In *Thibadeau v. Thibadeau*, 441 N.W.2d 281, 285 (Wis. Ct. App. 1989), the Wisconsin Court of Appeals held that educational loans and grants were not income for purposes of setting child support. Finally, in *Milligan v. Addison*, 582 So. 2d 769, 769 (Fla. App. 1991), [3] the Florida Court of Appeals held that educational loans cannot be considered income because of their repayment provisions.

At least one jurisdiction has reached a different conclusion. In *Gilbertson v. Graff*, 477 N.W.2d 771, 774 (Minn. Ct. App. 1991), the Minnesota court held that educational loan proceeds over the amount required for books and tuition are considered income. The Minnesota court emphasized that the money exceeding tuition and book expenses was dedicated to personal living expenses and not to educational needs and that, if the parties had remained married, they would have counted on receiving the excess proceeds. *See id.* The Minnesota court also reasoned that the state's statutory definition of income as "any form of periodic payment to an individual," clearly included excess student loan proceeds which "are a periodic and reliable source of income." *Id.*

The Tennessee definition of income as quoted above differs substantially from that of Minnesota and, therefore, the reasoning of the Minnesota court is less persuasive. As noted above, Tennessee's definition of income is substantially similar to that of California. As in California, the Tennessee definition of income lists sources of gross income for which there is no expectation of repayment. For an educational loan, normally, there is an expectation that the funds will be repaid.

---

[3] *Milligan* was overruled on other grounds by *Overbey v. Overbey*, 698 So.2d 811, 815 (Fla. 1997).

Therefore, we hold that educational loans with an expectation of repayment are not considered "income" for purposes of determining child support under the Tennessee Child Support Guidelines.

In this case, there is no dispute that Father receives approximately $20,000 per year in educational loans. The proceeds from these loans are not considered income for child support purposes unless there is no expectation of repayment.

Father's other income, consisting of his rental income and disability payments, clearly fall within the definition of gross income listed in the child support guidelines. The record in this case does not indicate the income on which the trial court based its award of $300 per month in child support, nor does it contain a written finding justifying a deviation from the child support guidelines, as required under Tennessee Code Annotated § 36-5-101(e)(1). The guidelines would appear to require someone with Father's gross income (assuming the student loans are excluded) to pay substantially less child support than $300 per month. Therefore, we remand the cause to the trial court for factual findings as to Father's income. The trial court may, in its discretion, hear additional evidence; for example, the trial court could consider evidence indicating that repayment is not expected for Father's student loans. The trial court may then recalculate the amount of child support based on Father's rental income, his disability payments and any other appropriate income. A deviation from the guidelines should be accompanied by the appropriate written findings justifying the deviation.

Father also contends on appeal that the trial judge abused his discretion in failing to recuse himself and forcing Father to reveal facts about a pending complaint against the trial judge. Father alleges that the trial court was biased against Father because of his political activism in an advocacy group regarding child custody. Father contends that the trial court instructed him not to write any more letters to the editor of the local newspaper, and that this instruction interfered with his first amendment rights. Father also argues that the trial judge had a conflict of interest regarding the former Guardian Ad Litem on the case. At a pre-trial hearing on November 10, 1997, Father objected to a discovery request that he reveal the names of individuals he had reported to the legal disciplinary board. At the hearing, the following exchange took place:

> THE COURT: All right. Have you reported any judge to the disciplinary board?
> MR. WINCHESTER: Yes, your Honor.
> THE COURT: Who was that?
> MR. WINCHESTER: Your Honor.
> THE COURT: And what grounds did you present to them; if you recall?

15

MR. WINCHESTER: It was basically that you were attempting to fringe [sic] upon my first amendment rights of free speech, that you had a conflict of interest with the former guardian ad litem from this case --

THE COURT: That I had a --

MR. WINCHESTER: An apparent conflict of interest.

THE COURT: What was the apparent conflict of interest?

MR. WINCHESTER: That the guardian ad litem's relationship to the court system and her use by the Court which resulted in the former chancellor in this case recusing himself has the same effect upon your Honor, and as a result you prevented me from presenting my motion to suppress the guardian ad litem reported at the previous hearing.

THE COURT: All right. Mr. Winchester, do you have any evidence that I've done anything at all, even contacted this woman, in any manner other than to tell you that I have read the report that had been filed by her, which had been ordered by Judge Morris?

MR. WINCHESTER: No, your Honor.

THE COURT: You have no proof that I've approached her or done anything with her, have you?

MR. WINCHESTER: No, your Honor.

THE COURT: And you're just saying that the fact that you reported me to the disciplinary board was the fact that I'm a judge and I'm in the system and being in the system I then would be biased to you?

MR. WINCHESTER: Well, that was a side issue in the complaint, your Honor.

In Tennessee, the decision of recusal is a matter within the judge's discretion. *See Wiseman v. Spaulding*, 573 S.W.2d 490, 493 (Tenn. App. 1978). The Code of Judicial Conduct provides that a judge should recuse himself when his impartiality may be questioned, including situations where "he has a personal bias or prejudice concerning a party." *Code of Judicial Conduct*, Canon 3(c)(1)(a) (1996); *see also State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993); *Lackey v. State*, 578 S.W.2d 101, 104 (Tenn. Crim. App. 1978). The record in this case does not establish that the trial judge abused his discretion by declining to recuse himself. The decision of the trial judge is affirmed on this issue.

In sum, we find no error in the trial court's decision to limit testimony and evidence concerning events that occurred subsequent to the first trial and which were already reflected in that record. Our review of the record indicates that the trial court adequately compared the fitness of the parties and did not err in refusing to suppress the Guardian Ad Litem's report. Based on undisputed facts as well as the trial court's determination of credibility and assessment of the parties' demeanor, we affirm the award of custody to Mother. We reverse the trial court's award of $300 per month in child support and remand for further factual findings and recalculation of the amount, in accordance with this Opinion. We find no abuse of discretion in the trial court judge's refusal to recuse himself.

The decision of the trial court is affirmed in part, reversed in part and remanded. Costs are taxed to Appellant and Appellee equally, for which execution may issue if necessary.

_____

_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**