# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE

## KENNETH HERBERT ABERNATHY v. KELLIE MICHELLE ABERNATHY

**Direct Appeal from the Circuit Court for Wilson County**
**No. 1654     Clara Byrd, Judge**

---

### No. M1999-00891-COA-R3-CV - Decided June 27, 2000

---

In this divorce action, Kenneth Herbert Abernathy (Father) appeals the trial court's final judgment awarding Kellie Michelle Abernathy (Mother) custody of the parties' five-year-old son, imposing certain conditions on the Father's visitation with the child, ordering the Father to pay $8819 to the Mother for her portion of the equity in the marital home, and ordering the Father to pay $5064 of the Mother's attorney's fees. We decline to address the Father's issues regarding the conditions placed on his visitation with the child because, at oral argument, the Father's counsel conceded that these issues were resolved by a subsequent order of the trial court removing the visitation conditions. In all other respects, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded**

FARMER, J., delivered the opinion of the court, in which HIGHERS, J., and LILLARD, J., joined.

Jon S. Jablonski, Nashville, Tennessee, for the appellant, Kenneth Herbert Abernathy.

Jessica Dawn Dugger and Gregory S. Gill, Lebanon, Tennessee, for the appellee, Kellie Michelle Abernathy.

### OPINION

The Father initiated this action in January 1998 when he filed a complaint for divorce against the Mother alleging the grounds of irreconcilable differences and inappropriate marital conduct. *See* Tenn. Code Ann. § 36-4-101(11), (14) (Supp. 1999). According to the Father's complaint, this was the Father's first marriage and the Mother's third marriage. The Father's complaint sought custody of the parties' minor child, a son born in January 1994. The Father asked the trial court to award him certain property, including, *inter alia,* all interest in the marital home and the Father's business, Aircraft Acrylic Repairs, Inc.

The Mother filed an answer and a counter-complaint for divorce in which she sought custody of the parties' child. In addition to the same grounds alleged in the Father's complaint, the Mother asserted that the Father was guilty of habitual drunkenness and that he abused illegal drugs. *See* Tenn. Code Ann. § 36-4-101(10) (Supp. 1999). The Mother asked the trial court to make an equitable division of the parties' real and personal property. The Mother also asked for an award of attorney's fees.

In March 1998, the trial court entered an agreed order granting the Mother temporary custody of the parties' child, setting forth the Father's visitation rights, and awarding the Father possession of the marital residence pending the final divorce hearing. Pursuant to a motion filed by the Mother, the trial court later entered an order requiring the parties and the child to submit to psychological evaluations.

After conducting a trial in March and April 1999, the trial court entered a final judgment awarding the Mother a divorce on the ground of inappropriate marital conduct. As pertinent to this appeal, the trial court's judgment awarded custody of the parties' child to the Mother, imposed certain conditions on the Father's visitation with the child, ordered the Father to pay $8819 to the Mother for her portion of the equity in the marital home, and ordered the Father to pay $5064 of the Mother's attorney's fees. With regard to the conditions placed on the Father's visitation with the child, the trial court's judgment required the parties and the child to attend behavioral modification counseling with Lori Drake-Bunch, specified that the amount of additional visitation that the Father was awarded would depend upon the Father's cooperation with Drake-Bunch and her recommendations, reserved the issue of the Father's summer visitation schedule pending the court's receipt of Drake-Bunch's report, and required that the Father's visitation with the child be supervised by the Father's mother.

On appeal, the Father contends that the trial court erred in (1) awarding custody of the parties' child to the Mother, (2) ordering the Father to participate in counseling with Lori Drake-Bunch as a prerequisite to the court's setting a summer visitation schedule, (3) requiring the Father's visitation with the child to be supervised by the Father's mother, (4) valuing the parties' residence, and (5) ordering the Father to pay a portion of the Mother's attorney's fees.

### I. Custody Award

Our review of the trial court's custody decision is governed by rule 13(d) of the Tennessee Rules of Appellate Procedure. *See Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. Ct. App. 1996); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Rule 13(d) requires this court, in conducting a *de novo* review of the record, to presume that the trial court's factual findings are correct, unless the evidence in the record preponderates otherwise. *See* Tenn. R. App. P. 13(d). In applying this standard of review, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch*, 874 S.W.2d at 575. Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and

-2-

credibility during the divorce proceedings themselves," appellate courts "are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The courts' paramount concern in a custody case is the welfare and best interest of the parties' minor children. *See Ruyle*, 928 S.W.2d at 441; *Koch*, 874 S.W.2d at 575. This determination necessarily turns on the particular facts of each case. *See Koch*, 874 S.W.2d at 575.

In making its custody decision, the trial court is required to engage in a "comparative fitness" analysis. *Gaskill*, 936 S.W.2d at 630. That is, the court is required to determine which parent is a comparatively more fit custodian than the other. *See id*. This factually-driven inquiry requires the court to carefully weigh, *inter alia*, the following considerations:

> (1)    The love, affection and emotional ties existing between the parents and child;

> (2)    The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

> (3)    The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

> (4)    The stability of the family unit of the parents;

> (5)    The mental and physical health of the parents;

> (6)    The home, school and community record of the child;

> (7)    The reasonable preference of the child if twelve (12) years of age or older. . . .

> (8)    Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . . .

> (9)    The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

> (10)    Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106 (Supp. 1999).

On appeal, the Father contends that the trial court erred in awarding custody of the child to the Mother because the evidence at trial established that the Father is the more stable parent and that the Father "deals with" the child more appropriately. The Father points to evidence that he has owned his own business since 1994 and that he has provided well for the family, whereas the Mother has had several different jobs during the same time period and has remained financially dependent on others. The Father also cites the testimony of several witnesses, including the Mother, who indicated that the Father exerts greater control over the child's behavior than does the Mother.

Despite the favorable evidence supporting the Father's custody request, we conclude that the trial court did not err in awarding custody of the parties' child to the Mother. The evidence at trial demonstrated that both the Mother and the Father are loving parents who are very involved in their child's life. In making its custody decision, however, the trial court indicated that it was particularly concerned with the child's behavioral problems and each parent's response to these problems. In awarding custody to the Mother, the court found that the Mother was open to the avenue of counseling and the court-appointed psychologist's recommendations that the child be evaluated for attention deficit hyperactivity disorder and oppositional defiant disorder. In contrast, the court found that the Father's attitude indicated that he was not open to the psychologist's recommendations. The trial court's comments also indicated that the court was concerned by evidence of the Father's illegal drug use, and in its final judgment, the court included a provision enjoining both parties "from using or possessing any illegal drug in the presence of the minor child."[1] In conducting its comparative fitness analysis, the trial court indicated that these two factors weighed in favor of awarding custody to the Mother.

We conclude that the evidence does not preponderate against the trial court's custody decision. Although much of the evidence at trial was disputed, virtually all of the witnesses agreed that the child exhibited behavioral problems both at home and at school. The Mother testified that the child was "a handful." At preschool, the child often sat in "time out" for failing or refusing to listen to his teachers' instructions and for running around the school instead of staying with his class. Other witnesses described the child as "rambunctious," "hyperactive," and even "uncontrollable." The psychologist appointed by the court to evaluate the parties and their son recommended that the child be evaluated for attention deficit hyperactivity disorder and oppositional defiant disorder. The Mother testified that she agreed with the psychologist's recommendations for further evaluations.

In contrast, the Father demonstrated less willingness to acknowledge the seriousness of the child's behavioral problems or to seek appropriate guidance from professionals in dealing with these problems. When asked if the child needed counseling for his behavioral problems, the Father's only response was that the child "needed his daddy." On one occasion, the Mother convinced the Father to attend a counseling session to address the child's behavioral problems. Instead of focusing on the subject of the counseling session, the Father insisted on explaining to the counselor why he and the Mother were divorcing. When the counselor tried to redirect the Father's focus to his son's

---

[1]Although this provision specifically enjoined both parties, we note that the record contains no evidence that the Mother has used illegal drugs.

behavioral problems, the Father responded by stating that the reason the parties were there was because the Mother could not "keep her legs closed."[2] At trial, the Father admitted that he made this statement to the counselor, although he disputed the Mother's testimony that the child was present when the statement was made. The Father also admitted telling the counselor that he did not need a woman telling him how to raise his son. The Father testified that he made this statement after the counselor told him that whipping a child with a belt was inappropriate.[3]

As for the Father's alleged drug and alcohol use, the Mother testified that the Father drank excessively and sometimes smoked marijuana. The Mother found marijuana and a pipe in the Father's bathrobe pocket and rolling papers on the floorboard of the Father's truck. The Father drank at least one six-pack of beer every day. On one occasion, the Father took prescription pain medication from the Mother's purse. When the Mother confronted the Father about his use of illegal drugs, the Father defended his behavior, insisting that his drug use was not "such a big deal" and that it was "okay to party every once in awhile." The parties separated after a December 1997 argument in which the Mother again confronted the Father about his drug use. The Father initially denied using drugs. As the confrontation progressed, however, the Father retrieved a plastic baggie and pipe from his truck and showed them to the Mother.

The Father denied being a regular drug user, and he testified that all of his work-related drug screens had been negative. The Father admitted, however, that he had smoked marijuana as recently as December 1997. The Father admitted that the Mother once found a bag of marijuana in his bathrobe pocket; however, the Father claimed that he found the bag in his driveway where one of his employees dropped it. The Father also admitted that the Mother found two pipes containing marijuana among the Father's personal belongings; however, the Father claimed that the pipes were merely souvenirs from his youth. Finally, the Father admitted that he took some of the Mother's prescription pain medication from her purse.

Moreover, the Father acknowledged that he sometimes drank in the child's presence. For example, the Father and a friend drank beer when they took their children out on the friend's boat. The Father also drank Wild Turkey when he took his son to the bowling alley. According to the Father, he did not drink to excess, and he drank only one and one-half to two cases of beer per month, not the six-pack-per-day habit described by the Mother. The Father testified that, if necessary, he would "give up anything" for his son, including drinking; however, he also testified that he would not give up drinking unless the trial court ordered him to do so.

_____

[2]The Father's statement apparently referred to his suspicions that the Mother was engaging in an adulterous affair with a long-time friend. Despite hiring a private investigator and paying him $3000 to investigate the Father's suspicions, the Father was unable to present any proof to support these allegations.

[3]The Father previously had testified that he occasionally whipped the child with a belt. The Father explained that, "[e]arly on, years ago, when he [the child] was like two and a half years old, I broke a switch off a tree two or three times. . . . After that, I ain't got no problem."

We conclude that the foregoing evidence supported the trial court's decision to award custody of the child to the Mother. As we previously indicated, in making its custody decision, the trial court was required to consider, among other factors, the disposition of the parents to provide the child with medical and other necessary care and the mental and physical health of the parents. *See* Tenn. Code Ann. § 36-6-106(2), (5) (Supp. 1999). The foregoing evidence directly related to both of these factors. As indicated by the Father's own testimony, the Father was less willing than the Mother to seek professional guidance in dealing with the son's behavioral problems. In fact, the Father appeared reluctant to admit that the son had any significant behavioral problems. Additionally, although the Father contended that his alcohol and drug use did not adversely impact the child, we believe that the trial court properly considered this evidence when the court evaluated the parties' comparative fitness to have custody of this child.

## II. Visitation Conditions

In his second and third issues, the Father challenges certain aspects of the trial court's final judgment regarding his visitation with the child. Specifically, the Father contends that the trial court erred in ordering him to participate in counseling with Lori Drake-Bunch as a prerequisite to the court's setting a summer visitation schedule and in requiring the Father's visitation with the child to be supervised by the Father's mother.

We decline to address these issues because, at oral argument, the Father's counsel conceded that these issues were resolved by an agreed order entered in December 1999 whereby the trial court removed the foregoing conditions on the Father's visitation with the child. *See, e.g.*, *Donegan v. Donegan*, No. 01A01-9709-CH-00469, 1998 WL 639113, at *2 (Tenn. Ct. App. Sept. 14, 1998) (*no perm. app. filed*) (recognizing that custody issue raised on appeal was moot where trial court's subsequent decision created different custody situation). Moreover, upon reviewing the record, we find no indication that the Father objected to these conditions below, although he had several opportunities to do so. *See, e.g.*, *Smith v. Smith*, No. 03A01-9603-CV-00078, 1996 WL 591181, at *3 (Tenn. Ct. App. Oct. 11, 1996) (*no perm. app. filed*) (holding that father waived issue regarding condition prohibiting father from exposing child to cigarette smoke by not objecting to condition below).

## III. Valuation of Marital Home

As for the trial court's valuation of the parties' residence, the Father contends that the trial court erred in accepting John Massa's "as-is" appraisal of $114,000 because Massa testified that he deducted only $17,500 from the home's value to remedy its structural problems. The Father suggests that Massa, a residential real estate appraiser, was not qualified to testify to the cost of repairing the home. The Father insists that the trial court instead should have accepted the repair estimate of the Father's expert, Barry Stafford, who testified that the house needed over $24,000 worth of structural repairs. The evidence showed that the house needed structural repairs because water had flooded the underside of the house and damaged its foundation.

We conclude that this issue lacks merit. At trial, John Massa testified that he was a certified appraiser of residential real estate. Massa appraised the parties' residence at $114,000. Massa testified that he appraised the property in an "as is" condition, taking into account the structural problems that were brought to his attention by the Father. Massa deducted about $17,500 from the home's value because he estimated that this amount would be required to remedy the home's structural problems. Massa talked to several different contractors and builders in the area, and he relied on their opinions to arrive at a repair estimate.

On cross-examination, the Father's counsel asked Massa why he disregarded Barry Stafford's repair estimate of over $24,000. Massa responded by explaining that, in his opinion, the home did not need all of the repairs included in Stafford's estimate. Massa also testified that some of the repair costs included in Stafford's estimate appeared excessive. Although the Father's counsel attempted to impeach Massa concerning the bases for his repair estimate of $17,500, significantly, the Father's counsel raised no objection to the admissibility of Massa's testimony.

Under evidentiary rule 703, "an expert witness may base an opinion upon matters that are not of his personal knowledge and that otherwise constitute inadmissible hearsay if those matters are of a type reasonably relied upon by experts in that field." *State v. Abbott*, No. 02C01-9311-CC-00263, 1995 WL 422810, at *4 (Tenn. Crim. App. July 19, 1995), *perm. app. denied* (Tenn. Dec. 28, 1995) (citing Tenn. R. Evid. 703).[4] In the present case, the Father's counsel did not challenge Massa's qualifications to testify as an expert in the field of appraising residential real estate. Massa testified that, in appraising the parties' residence, he necessarily relied upon the repair estimates of several contractors and builders in the area. Although Massa's testimony did not explicitly address the requirements of rule 703, his testimony suggested that the contractors' and builders' repair estimates were matters of a type reasonably relied upon by experts in his field. Under these circumstances, we reject the Father's argument that the trial court was required to reject Massa's appraisal just because it was based, in part, upon information provided by area contractors and builders.

Had the Father raised a contemporaneous objection to the admissibility of Massa's testimony regarding the cost of repairing the residence, perhaps Massa would have testified more fully regarding the sources of his repair estimate and whether this information constituted matters of a type

---

[4]Rule 703 contains the following provisions:

> **Bases of opinion testimony by experts.** – The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

reasonably relied upon by experts in his field. In the absence of such an objection, however, we decline to reverse the trial court's judgment wherein it adopted Massa's appraisal of the parties' residence. *See Abbott*, 1995 WL 422810, at *4 (concluding that trial court did not commit reversible error in allowing pharmacist to testify about therapeutic values of specific drugs where pharmacist's testimony was based upon information he obtained from doctor and where appellant failed to enter contemporaneous objection to admissibility of testimony).[5]

### IV. Attorney's Fee Award

We also reject the Father's contention that the trial court erred in ordering him to pay a portion of the Mother's attorney's fees. On appeal, the Father contends that the trial court's award of attorney's fees constituted an award of alimony *in solido* and that, pursuant to this court's holding in *Aleshire v. Aleshire*, 642 S.W.2d 729, 733 (Tenn. Ct. App. 1981), the award was improper because the Father has no cash assets with which to pay the award and because alimony *in solido* may not be awarded from future earnings.

We believe that the Father's argument misconstrues this court's holding in *Aleshire*. In *Aleshire*, we held that, as a general rule, alimony *in solido* should be paid out of the obligor spouse's present estate and should not be awarded out of an expectation of the obligor's future earnings. *See Aleshire*, 642 S.W.2d at 733. Contrary to the Father's suggestion, however, *Aleshire* does not stand for the proposition that alimony *in solido* must be paid out of the obligor spouse's "cash assets." Rather, *Aleshire* refers to the obligor's "present estate." *See id*. For purposes of paying an award of alimony *in solido*, the obligor spouse's present estate may include the obligor's share of the marital property, the obligor's separate property, and any equity therein. *See Coke v. Coke*, No. 02A01-9210-CV-00279, 1993 WL 477016, at *4 (Tenn. Ct. App. Nov. 15, 1993) (*no perm. app. filed*).

Moreover, even if the obligor spouse has no "present estate," *Aleshire* does not prohibit the trial court from awarding alimony *in solido*. In *Aleshire*, we explained that extreme circumstances could arise where the trial court might find it necessary to require the obligor to pay alimony *in solido* from future earnings. *See Aleshire*, 642 S.W.2d at 733. As examples, we cited two possible scenarios, including the situation where "a spouse intentionally disposed of his or her tangible assets in order to deprive the other spouse of alimony *in solido*" and the situation where "a spouse entered into the marriage solely to have his or her spouse work and provide him or her with an education." *Id*. In subsequent decisions, we have recognized additional situations, such as where the obligor spouse received the benefit of certain bank loans which later were discharged in bankruptcy, *see Marler v. Marler*, 1986 WL 1146, at *2 (Tenn. Ct. App. Jan. 28, 1986) (*no perm. app. filed*), where the obligor spouse disposed of marital assets without informing the other spouse, *see Houghland v.*

---

[5]We note that, in his closing argument, the Father's counsel argued that Massa's estimate was "pure hearsay." In light of counsel's failure to raise a hearsay objection during Massa's testimony, we believe that this argument went to the weight that should be given Massa's testimony rather than to its admissibility.

***Houghland***, 844 S.W.2d 619, 622-23 (Tenn. Ct. App. 1992), and where the recipient spouse incurred debts to educate herself so that she could become self-supporting, ***see Day v. Day***, 931 S.W.2d 936, 939 (Tenn. Ct. App. 1996).

Even if the Father has no present estate from which to pay alimony ***in solido***, we conclude that circumstances exist in this case which support the trial court's award of attorney's fees. At trial, the Father's counsel conceded that many of the problems that the attorneys in this case "had to deal with were caused by [the Father's] behavior." The Father's counsel also conceded that the Father "probably should be responsible for some, but not all, of [the Mother's] attorney fees." Under these circumstances, we conclude that the trial court did not err in ordering the Father to pay a portion of the Mother's attorney's fees.

In any event, regardless of the propriety of an award of attorney's fees as alimony ***in solido***, we conclude that the trial court was authorized by statute to order the Father to pay a portion of the Mother's attorney's fees. ***See Beem v. Beem***, No. 02A01-9511-CV-00252, 1996 WL 636491, at *8-*9 (Tenn. Ct. App. Nov. 5, 1996) (***no perm. app. filed***). Tennessee Code Annotated section 36-5-103(c) provides that

> [t]he plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of the court.

Tenn. Code Ann. § 36-5-103(c) (Supp. 1999).

As indicated by its language, section 36-5-103(c) authorizes an award of attorney's fees in custody proceedings "both upon the original divorce hearing and at any subsequent hearing." ***Id***. In awarding attorney's fees pursuant to section 36-5-103(c), the trial court may consider proof of inability to pay, but "ability to pay should not be the controlling consideration." ***Sherrod v. Wix***, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992). Such awards are designed "not primarily for the benefit of the custodial parent but rather to facilitate a child's access to the courts." ***Id***. at 784.

In the present case, the primary issue litigated by the parties was the custody of the minor child. Inasmuch as the trial court's final judgment awarded custody of the child to the Mother, we conclude that the trial court possessed the authority to order the Father to pay a portion of the Mother's attorney's fees incurred below. We further conclude that the Mother's request for an additional award of attorney's fees on appeal has merit. Accordingly, we remand this cause to the trial court to determine and award a reasonable fee for the time and expenses of the Mother's

attorney on appeal. ***See Holt v. Holt***, 995 S.W.2d 68, 78 (Tenn. 1999); ***D v. K***, 917 S.W.2d 682, 687 (Tenn. Ct. App. 1995); ***Akins v. Akins***, 805 S.W.2d 377, 379-80 (Tenn. Ct. App. 1990).

The trial court's judgment is affirmed, and this cause is remanded for the trial court to conduct a hearing to determine the Mother's reasonable attorney's fees incurred on appeal. Costs of this appeal are taxed to the appellant, Kenneth Herbert Abernathy, for which execution may issue if necessary.