IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 20, 2001 Session

## SHAWN PATRICK FARIEN v. REGINA CANTRELL FARIEN (McKINNISH)

An Appeal from the Circuit Court for Shelby County
No. 151944 - 8 R.D.    D'Army Bailey, Judge

No. W2000-00656-COA-R3-CV - Filed June 13, 2001

This is a child custody case. The parties and their minor child lived in Tennessee with the father's parents. The mother moved to Georgia with the child to live with her parents. Custody was awarded to the mother, and the father was granted broad visitation rights. The father appeals. We affirm, finding that the custody award is based in large part on the trial court's determinations of credibility and assessment of the parties' demeanor, and finding that the evidence does not preponderate against the award of custody to the mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S. and DAVID R. FARMER, J., joined.

James D. Causey, David E. Caywood, Marc E. Reisman, Memphis, Tennessee, for the Plaintiff/Appellant, Shawn Patrick Farien.

Melinda Plass Jewell, Cordova, Tennessee, for the Defendant/Appellee, Regina Cantrell Farien (McKinnish).

### OPINION

In this child custody case, Shawn Patrick Farien ("Father") and Regina Cantrell Farien (now McKinnish) ("Mother") were married on June 26, 1993. At the time of marriage, Father was twenty years old and Mother was eighteen. The parties had met at a church camp, and soon thereafter, Mother became pregnant. The parties' only child, Joshua Perrin Farien ("Perrin"), was born on September 14, 1993.

Mother, Father and Perrin resided with Father's parents, Mike and Mary Farien, in Germantown, Tennessee. Father's parents purchased their home in anticipation of having Mother, Father and their child live with them. Father's parents paid for their wedding and their honeymoon.

At the time of the marriage, Father was full-time student at the University of Memphis, pursuing a degree in mechanical engineering. He graduated in August 1995. During the marriage, Mother stayed at home full-time to care for Perrin. In January 1996, Mother left Father's parents' home in Tennessee, taking Perrin with her to her parents' home in Georgia. Father filed for divorce on April 19, 1996, citing irreconcilable differences and inappropriate marital conduct, and seeking custody of Perrin.

The parties later agreed to a temporary joint custody arrangement whereby Mother and Father would have Perrin for alternating two week periods until the issue of custody was resolved by the court. On July 22, 1997, Mother and Father stipulated the grounds for divorce and agreed to refer the issue of child custody to Judge Wyeth Chandler for arbitration.

Judge Chandler held the first hearing on July 23, 1997. At the conclusion of the hearing, Judge Chandler was dissatisfied with the circumstances regarding both Mother and Father. Consequently, the parties were declared divorced and an award of temporary custody was made, expressly reserving the issue of permanent custody. After Mother filed a petition to modify custody, a second hearing was held on July 28, 1999. Thereafter, permanent custody was awarded to Mother.

At the first hearing, Father testified that when the parties married, he was a full-time student at the University of Memphis, pursuing a degree in mechanical engineering. Father is the only child of Mike and Mary Farien. Prior to the parties' marriage, Father's mother, Mary Farien, had been a homemaker for twenty years. Mary Farien obtained a full-time job after the parties moved into their home, in order to have enough money for the needs of all five members of the household.

Father obtained his degree in mechanical engineering in August 1995. However, at the time of the first hearing, nearly two years later, Father had not obtained employment in his field. Instead, he worked part-time at a hobby store. He described sending out approximately 200 resumes, to no avail. He noted that Mother sent his resume to a potential employer in the Nashville area, but that Father's mother, Mary Farien, told him that it was "a bad place to work." Father admitted that he was unable to support his family financially during the marriage, even after he was no longer a student, and that they depended on his parents to provide them with room and board. Father said that his parents paid for several vacations, including a trip to Disney World for the parties, their child and Father's parents. Despite the generosity of his parents, Mother and Father still managed to accumulate over $11,000 in credit card debt during the course of the two and a half year marriage.

Father testified that he and Mother got along fairly well during their marriage, but that he was concerned about the way she treated Perrin. He stated that Mother showed impatience toward him and a lack of interest in his well-being. Father described an instance in which Perrin became ill and began to run a high fever. When Father came home, his parents told him that, although Perrin's fever had gone down, they felt he should be taken to the emergency room. Father agreed with his parents, and they took Perrin even though Mother did not think it was necessary. At the emergency room, Mother and Father were given a prescription for antibiotics and sent home at approximately 2:00 a.m. Mother thought filling the prescription could wait until morning, so she and Perrin went

to sleep. Mary Farien and Father felt the medication should be obtained immediately. Father testified that he took his mother to the 24-hour drug store with him at 2:00 a.m. because he felt "safer" having her with him to go to a store "in a bad section of town."

Father also described Mother as less than industrious. He stated that when he came home in the afternoons, he would find Mother still in her nightgown and Perrin in his blanket sleeper with a dirty diaper on. He stated that Mother would be watching television, there would be dirty dishes and dirty diapers lying about, and Perrin would be doing whatever he wanted. He testified that Mother rarely assisted his family in cooking and cleaning. He said that he and his parents hoped Mother would help more in cleaning the house, but that "eventually my parents hired a maid" to help clean. Father said, prior to the parties' separation, both of them were working part-time. Father acknowledged that Mary Farien had frequently provided more care of Perrin than he did, citing his "time constraints."

Father testified that when Mother left in January 1996, he had no indication that she planned to leave him. He testified that his mother came home in the mid-afternoon and found a note from Mother stating that she and Perrin had gone to Georgia and would return. When it became apparent to him that they were not coming back, Father testified that he tried to make arrangements to visit Mother and Perrin in Georgia, and that Mother refused, saying that if he came, "there would be shotguns in the hills waiting for you." Despite this warning, Father went to Georgia to see Mother and Perrin. The efforts at reconciliation failed.

Father testified the parties had always agreed to call their son by his middle name, Perrin, but after Mother moved to Georgia she began calling their son by his first name, Joshua. Father said that during the initial period of separation, Mother allowed him to speak with Perrin on the telephone, but refused to let him have visitation. Since that time, the parties had agreed on a temporary schedule whereby Perrin resided with each party for alternating two-week periods. Father said that his parents would normally accompany him to Nashville to get Perrin, but that a couple of times, his mother had gone to pick up Perrin without him.

Since the separation, Father testified that he took Perrin to see a specialist for his speech difficulties.[1] As a result, Father took Perrin for speech therapy sessions while he was in Father's care.

Mary Farien testified at the hearing. She testified that she and her husband purchased their Germantown home to accommodate themselves, Mother, Father, and Perrin. In addition, she began working full-time outside the home in order to help support Mother, Father, and Perrin. She testified that she, her husband, and Father encouraged Mother to finish her high school education, and they helped her enroll in a home schooling program.

---

[1]Father took Perrin to see the specialist at the suggestion of Dr. Stacy Dixon, the psychologist retained by the Guardian Ad Litem to perform a custody evaluation.

Mary Farien testified that she became concerned that Mother was not holding Perrin often enough, and that she was afraid Perrin would bond with her rather than with Mother. She stated that she "personally felt" that Mother did not attend to Perrin's needs as she should have, and that she often came home and found Perrin in diapers that needed to be changed and in a blanket sleeper when it was clearly too hot for him to be wearing one. She corroborated Father's version of the incident in which Perrin was taken to the emergency room with a high fever, and that she thought the prescription was needed right away, so she went with Father to an all-night drug store in Memphis to fill the prescription because she did not think it was safe for Father to be alone at night in the city.[2] She testified that Mother rarely helped cook and clean, and that she, not Mother, was generally the one who fed Perrin, when she was not at work.

Mother also testified at the July 1997 hearing. She testified that the immediate cause of her decision to go to Georgia in January 1996 was Father's insistent denial of her desire to bring Perrin to Georgia to see her cousin get married. She stated that she did not intend to leave Memphis permanently, but decided to stay in Georgia after Father came to her parents' home in Georgia.

Mother testified that living in the Fariens' home was difficult for her. She said that whenever she tried to cook or clean, Mary Farien would typically intervene and tell her that she was not doing something right, and that she found it best to let them handle everything in their home. She denied leaving Perrin in dirty diapers or leaving dirty diapers lying around the house. Mother described her frustration at Father's half-hearted attempts to obtain full-time employment, so that they could move to their own apartment. She said that Father's suggestions were that she get a full-time job or that they move into an apartment funded by his parents. She described telling Father about openings for engineers at the Nissan plant in the Nashville area, and said that Father refused to apply because he did not want to work in a factory. She said that she refused Father's visitation in Georgia initially on the advice of her lawyer, who advised her to wait until Father had an attorney and a temporary custody agreement could be reached. She stated once she moved to Georgia, she started working full-time as a floor tech in a nursing home, and had moved up to becoming a nurse's assistant. Since then, in addition to working, she started nursing school at her own expense, had purchased and paid for a car, and had paid her lawyer's fees.

On cross examination, Mother admitted that she had not obtained a record of Perrin's medical shots and had not taken him to see a pediatrician, even though they had been in Georgia over a year. She said that she had no religious beliefs that prevented her from seeking appropriate

---

[2]Judge Chandler later asked Mary Farien about this during her testimony:

THE COURT: Now, you're saying that the reason that you went with him at two o'clock in the morning is because he shouldn't be out in the same area at two o'clock?

THE WITNESS: I was concerned about him being by himself at two o'clock in the morning on the streets of Memphis.

THE COURT: That's - - he's a 24 year old white male.

THE WITNESS: I understand that, sir, yes.

THE COURT: And you're worried about him being out at two o'clock in the morning?

THE WITNESS: Yeah, I was.

THE COURT: All right, go ahead.

medical treatment for Perrin when he needed it. Mother admitted that she began calling Perrin by his first name, Joshua, explaining that it was because she did not want Perrin's first name to nearly rhyme with his last name, Farien.

The trial court heard testimony from Dr. Stacey Dixon, a clinical psychologist, requested by by the Guardian Ad Litem to do an evaluation. Dr. Dixon had interviewed Father, Mother, and both sets of grandparents, and she observed their interactions with Perrin. She found no significant mental illness in any of the parties. Dr. Dixon recommended that custody of Perrin be placed with Mother because she was his primary caregiver, and she thought it best not to disrupt that relationship so long as there was no significant threat to Perrin's well-being. Judge Chandler heard testimony from the remaining grandparents and a friend of Father's as well.

At the initial hearing, Judge Chandler was candid about his concerns about both parties. He observed that, while there was criticism of Mother's care of Perrin, there was no question but that she had been Perrin's primary caregiver. He stated that he had "a lot of misgivings about both of these people" and said:

> In my judgment, for a man of his age and education to have as little ambition to earn as little amount of money and to do as little as he's done is just unbelievable. But this lady wasn't doing a lot more . She was doing less.

He described the dispute as "almost a battle between this mama, who has now apparently gone back to her home in Georgia, and the grandmother." Commenting on the episode in which Perrin was taken to the emergency room for a high fever, Judge Chandler said:

> That story about the medicine, I'll never get over that. I don't know what - - it just - - it boggles my mind.
>
> * * *
>
> . . . [Y]ou've got some toughening up to do, son. In my opinion, you are a - - you said you had to get your mama to go down with you to get that medicine. You put me in a real - - on the spot.

He questioned Mother at length about calling Perrin by his first name, Joshua, after moving to Georgia, calling it "confusing" and "not good for the child." He questioned her to be certain that she did not hold any religious beliefs that inhibited her from taking the child for medical help when necessary. Observing that both parties needed to be "pushed out of the nest," Judge Chandler said, ". . . it's very difficult to assign the life of a child to somebody who has not established their own nest for themselves, and that is just something that I don't think either one of you at this point have done that."

In his written findings after the first hearing, Judge Chandler stated that he was unable to make a decision as to which parent should have permanent custody of Perrin, because neither Mother nor Father was fully independent and capable of raising Perrin on his or her own. He placed

temporary custody of Perrin with Father, "so long as he remains a resident of his parents' Germantown home." He granted Mother custody during the summer months and during specified holidays, provided that she remained a resident of her parents' home in Georgia. He ordered that when Perrin was with either parent, the other had the right to visitation every other weekend. He ordered that the parties should share in Perrin's medical expenses, and that they should refer to him as "Perrin," not "Joshua." In his findings, Judge Chandler stated:

> The Court, by virtue of the nature of this Order, is keeping all options open for the final determination of child custody in this matter. The Court specifically finds that there does not have to be any substantial change in circumstances before custody could be changed.

> When making a final determination as to child custody, at a hearing to be set on a date certain in July, 1999, the Court will take into consideration the evidence of what changes have taken place in the actions or inactions of each of the parents and make its determination based on the guidelines set out in the ***Bah*** case, together with the Court's findings as to where the best interests of the child will be served.

Prior to the second hearing, Mother remarried. At that time, while Perrin was at Father's home, she moved out of her parents' home into the home of her new husband. During the time between the first and second hearings, Father remained in his parents' home.

The second hearing was held on July 28 and 29, 1999. Father testified that after Mother moved out of her parents' home, she refused to tell Father her address or phone number or even the fact that she had remarried. Mother would tell him only that she had sent the necessary information to him in a letter. The letter he later received, however, contained only Mother's new telephone number and her post office box for mail; it did not include the physical address for her new home. Father testified that he had been employed full-time as a design engineer at Plant Maintenance Service Corporation near Memphis since October 1997, and was making approximately $30,000 per year. He testified that he had continued to live with his parents because he thought it was required under the trial court's previous order, and that he paid his parents $250 per month in rent. He also said that he had made progress toward paying the parties' credit card debt. He testified that he had enrolled Perrin in speech therapy and that he alone paid for it because Mother believed it was an educational expense, not a medical expense. Father said that he had enrolled Perrin in kindergarten at a private school, at his expense. Father complained that Mother had on occasion called Perrin by "Joshua" or "Joshua Perrin," in contravention of the trial court's order. He expressed concern that Mother said things to Perrin to undermine Father's relationship with Perrin, and said that Perrin would sometimes whisper to him over the telephone that he wanted to come home to Memphis. Father asserted that Perrin was well-behaved at school. However, he admitted that the child had "head-butted" his paternal grandmother, Mary Farien, so hard that he broke her nose.

On cross-examination, Father admitted that, at 27 years old, he had never lived outside his parents' home. He said that he began paying rent to his parents only after he obtained full-time

employment at Plant Maintenance. Father testified that when he went to pick up Perrin after Perrin had spent time at Mother's home, he and his mother and father normally went "as a family." He said there had been occasions on which his mother and father drove Perrin, without Father. Father acknowledged that the only time he had spent the night with Perrin without his parents, he had been at the home of relatives of his parents. In response to Judge Chandler's questions, Father said he had never been away alone with Perrin for a weekend. Father testified that it was his intent to move out of his parents' home and get an apartment for he and Perrin. He did not know if there was an apartment complex near his parents' home that he could afford.

Mother testified at the second hearing as well. She said that she had obtained her license as a licensed practical nurse, going to school full-time for fifteen months. Prior to becoming licensed, she obtained a full-time position at a local medical center, working a variety of work schedules. At the time of the hearing, she was employed full time from 7 a.m. to 3 p.m. as a charge nurse at the Union County Nursing Home, making $11.34 per hour. Mother testified that she had remarried approximately one year earlier, on July 25, 1998. She said that she and her new husband, Arthur McKinnish, had taken a parenting class together. She testified that she mailed notice of her new address and phone number to Father and Judge Chandler a little over a week after her marriage, on August 3, 1998. (168) She testified about a heated conversation with Father on the phone in which he demanded that she give him her new address and phone number. She refused, telling Father she had sent him a letter with the information and saying, "you will demand nothing of me." Mother testified that she told Father her new phone number during this conversation. However, unbeknownst to her, Father had recorded the phone conversation, and the tape indicated that she had in fact not given Father the phone number. Mother then said that her recollection had been mistaken, and admitted that she had refused to give Father her new phone number during that telephone conversation. Mother acknowledged that the letter she sent to Father included her new telephone number and post office box address for mail, but it did not include her new physical address.

Mother said that she did not disagree with Perrin receiving speech therapy, but believed speech therapy was an educational expense because every public school that she had checked into for Perrin offered speech therapy for free to children who needed it. She stated that Perrin would receive speech therapy at his school in Georgia free of charge. Mother stated that she usually referred to Perrin by his middle name, Perrin, and that she sometimes called him "Joshua Perrin," or "J.P.."

Mother testified about an incident in which Perrin was hospitalized for appendicitis while he was with Father in Alabama, right before she was supposed to pick Perrin up at a pre-arranged location. Mother testified that Perrin had been ill all weekend and had been in the hospital with acute appendicitis since that morning. Mother said that Father did not call her and tell her about Perrin's condition. At approximately seven o'clock in the evening, about an hour before Mother was to leave to pick up Perrin, Father's aunt called her to tell her that Perrin was being taken into surgery. Mother lives approximately three and a half hours from the hospital at which Perrin's surgery took place, so she arrived at the hospital after the surgery was over and Perrin was in a hospital room. When she arrived, she said that Father told her she could not come there and "control the situation."

When she went into Perrin's room, Mother testified, Mary Farien was angry and confrontational with her in Perrin's presence, telling her, "You don't treat my son this way." Mother testified that she had to tell Mary Farien repeatedly to take it "out in the hall" because it was inappropriate to argue in front of Perrin.

Mother also was concerned that Father and his parents were undermining her relationship with Perrin. She said that Perrin sometimes told her, "We're better than you," referring to himself and the Fariens as being better than Mother and her family. Mother also testified at length about her concerns that Perrin was watching violent television shows and computer games at Father's house, and that this contributed to his unruly behavior, culminating in Mary Farien's broken nose and another incident in which Perrin jumped off of a bed onto Mike Farien and broke some of his ribs.

In addition to Mother and Father's testimony, Judge Chandler also heard further testimony from Mike and Mary Farien, Karen Cantrell (Perrin's maternal grandmother), Arthur McKinnish (Mother's husband), Katherine Emslie (Mother's aunt), and Dorothy June Charles (Mother's friend). Father's expert, Dr. Fred A. Steinberg, testified that he had evaluated Father and his parents and had interviewed persons who knew them, and found that Father possessed no characteristics that would prevent him from being a good parent. Dr. Steinberg did not interview Mother or her family.

Judge Chandler also conferred privately with Perrin. At one point, Perrin said that he would prefer to stay in Tennessee, but he also stated that he had fun in Georgia and that he loved his Mother and stepfather. At another point, Perrin stated that his Father was better than his Mother, because he had more games to play.

The trial court's comments at the conclusion of the second hearing indicated that the issue of custody remained difficult. Judge Chandler stated:

> Let me say one thing, that I'm going to be judging this case in the end of it as a case where this lady and this man are married and living in a home and in the neighborhood and the place and location that they're now living in, and I've heard nothing really bad about it. And I'm going to judge it from this man's standpoint as if he had taken the child out and was living in an apartment for the first time apparently ever on his own and with the help of parents who would stand ready to help him should he need it. But that's the two statuses that I'm going to look into, because I'm not going to compare the home where he now lives with the home where this group lives, the type of living conditions that he now has compared to what they have. It will be as a person living out in an apartment in the Germantown area with the income that he's making and with the necessary plans that he's making.

> I think to do otherwise would be an injustice because, first of all, I don't know how long the family will be around. I've got to view him as now the new single parent of this child in making a final decision about it. Even though he hasn't moved, he and the family have adamantly stated that they intend to move and move quickly.

So that must, I believe, the manner in which I view his situation, so that will be the way that I'll be looking at it.

On February 18, 2000, the trial court entered an order granting full custody to Mother. The trial court granted Father broad visitation rights, including eight weeks during the summer, one week for spring break, one week for Christmas, and a weekend for Thanksgiving. In addition, Father was ordered to pay child support of $419 per month, and Mother was ordered to pay for half of the speech therapy Perrin received while in Father's custody. From this order, Father now appeals.

On appeal, Father raises two issues. He argues that the trial court erred in awarding custody to Mother because the evidence showed that he was better suited to raise Perrin. Secondly, Father argues that the trial court erred by not applying the newly enacted child custody relocation statutes because Perrin has lived in Memphis, Tennessee his entire life.

In child custody cases, appellate review is *de novo* upon the record, with a presumption of correctness applied to the trial court's factual findings. *See* Tenn. R. App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. Ct. App. 1993).[3]

We first consider Father's argument that the evidence preponderated against the trial court's finding that Mother was comparatively more fit to have custody of Perrin. Tennessee Code Annotated § 36-6-101(a) requires that custody of children in divorce be determined "as the welfare and interest of the child or children may demand." Tenn.Code Ann. § 36-6-101(a) (1) (Supp.2000). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App.1983), the Court set forth a common sense approach to determining custody, the doctrine of "comparative fitness." The *Bah* Court noted that "[t]he paramount concern in child custody cases is the welfare and best interest of the child." *Bah*, 668 S.W.2d at 666. *See also Ruyle v.Ruyle*, 928 S.W.2d 439, 441 (Tenn. Ct. App.1996); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). This determination depends on the facts of each case. *Koch*, 874 S.W.2d at 575. Tennessee Code Annotated § 36-6-106 sets forth some of the factors to be considered in performing a comparative fitness analysis. These factors include:

(1) The love, affection and emotional ties existing between the parents and child;

---

[3]The parties agreed to refer this case to Judge Chandler for arbitration, and the initial order of the trial court indicates that the parties agreed to accept his recommendations as binding. The trial court stated that the "decision of the arbitrator shall be submitted to the Trial Court for incorporation into a Final Decree of Divorce . . . ." However, the final order of the trial court granting custody to Mother stated that the matter was heard by Judge Chandler, "special judge appointed by consent of the parties." In an arbitration case, the Court of Appeals reviews the decision of the trial court under a "clearly erroneous" standard. See *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445, 449 (Tenn. 1996). The parties do not raise the issue of whether an arbitration standard of review should apply in this case. Under either standard, the outcome of this appeal would remain the same.

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . . .

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn.Code Ann. § 36-6-106 (Supp.2000).

In addressing child custody, we recognize that "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The trial court is in a better position than this Court to observe the parties' demeanor and determine their credibility. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). "Since [child custody] decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997) (citing *Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988)).

In this case, evaluation of most of the pertinent facts is highly dependent on the trial court's evaluation of the parties' credibility and demeanor. Father and his witnesses testified that Mother

was insensitive to Perrin and slow to attend to his medical needs. Mother explained her actions and testified that she has no problem seeking medical help for Perrin; indeed, she is a licensed practical nurse. Mother and her witnesses argued that Father is overly dependent on his parents and not capable of caring for Perrin on his own. Father disputed this and testified that he is ready to care for Perrin. It is undisputed that Mother remarried and moved without informing Father and overly delayed giving Father her new telephone number and address and in even informing him of her remarriage. It is undisputed that after Mother moved to Georgia, she began calling Perrin by his first name, Joshua, despite the parties' earlier understanding that the child would be called Perrin. The proof was undisputed that Father failed to tell Mother of Perrin's impending appendectomy until it was underway, and Mary Farien was confrontational to Mother at the hospital in Perrin's presence. Both parties suspected the other of disparaging remarks to Perrin in order to undermine the other parent's relationship with him. Without a doubt, while both parties are loving parents, both have significant drawbacks, and cooperation and communication between the parties has been minimal at best. According appropriate deference to the trial court's assessment of the parties' credibility and demeanor, we cannot conclude that the evidence preponderates against the award of custody to Mother.

Father also argues on appeal that the trial court should have applied the child custody relocation statute, Tennessee Code Annotated § 36-6-108. This statute is inapplicable to this case because, by the time the hearing on custody was held, Mother was already living in Georgia. The trial court had before it the question of whether Mother, living in Georgia, would have primary custody, or whether Father, living in Tennessee, would have primary custody. The issue was not whether Mother should be able to move with Perrin to Georgia. This issue is without merit.

Mother has requested attorney's fees on appeal. This request is denied.

The decision of the trial court is affirmed. Costs are taxed to the appellant, Shawn Patrick Farien, and his surety, for which execution may issue if necessary.

_____

HOLLY KIRBY LILLARD, J.