IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 13, 2005 Session

## ROBERT HUGH BENSON v. DEBORAH WATKINSON

Appeal from the Circuit Court for Bradley County
No. V-03-129     Lawrence H. Puckett, Judge

No. E2004-01989-COA-R3-CV - FILED SEPTEMBER 9, 2005

Robert Hugh Benson ("Father") sued Deborah Watkinson ("Mother") for divorce. The parties have two minor children. The Trial Court granted the parties a divorce and designated Father as the primary residential parent with Mother to have no overnight visitation due to a finding of her alcohol abuse. Mother appeals to this Court. We modify the judgment only to order Father to attend and complete an anger management course, and affirm as so modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Morna K. McHargue, Knoxville, Tennessee, for the Appellant, Deborah Watkinson.

Eric S. Armstrong, Cleveland, Tennessee, for the Appellee, Robert Hugh Benson.

# OPINION

## Background

Father and Mother are British citizens who came to the United States in January of 2001, because of Father's job. The parties had lived together for many years in England and had two children together before getting married in May of 2000, in England. Originally, the parties intended to remain in the United States only temporarily and then return to England. Plans changed and Father now wants to remain in the United States, while Mother wishes to return to England. Father has a work visa and is permitted to work in the United States. Mother, however, does not have a work visa and may not work for pay while in the United States.

In February of 2003, Father filed for divorce. Mother answered the complaint and filed her counterclaim. The case was tried in July of 2003. On November 12, 2003, the Trial Court *sua sponte* entered an order granting a new trial "on the parenting plan issues in this cause focusing on the current situations of the parties and the children." The November 12 order required the parties to mediate the parenting plan issues prior to the new trial. The parties did mediate, but were unable to reach agreement on all issues. The new trial on the parenting plan issues was held in May of 2004.

This case has been contentious and the record on appeal includes multiple transcripts and numerous exhibits. The issues raised on appeal, however, deal solely with custody. We, therefore, confine our discussion of the facts to those directly relevant to the custody issues before us on appeal.

Mother testified she moved in with another man, Roger Park, in February of 2004, and that Mr. Park now is supporting her. She testified that although she and Mr. Park had two separate apartments prior to their moving in together, Mr. Park paid for both apartments. The house that Mother and Mr. Park now live in is across from and two doors down from Father's house. Mother testified that if she is awarded custody of the children, she intends to move back to England with them.

Mother admitted that she and Mr. Park have "disagreements" about once a week. Mother admitted that she called 911 on December 19, 2003, because Mr. Park had "gripped me and he started shouting at me . . ." and he "stopped me going out." Mother testified that Mr. Park is taking anger management classes because of the December 19, 2003 incident. When asked about her intentions with Mr. Park and the alleged abuse, Mother stated: "If things are at a level where I think it affects the children, then I'll move out."

Mother testified that on April 23, 2004, she, her daughter, and Mr. Park were driving to her daughter's school fair. Mother testified that during that drive, Mother and Mr. Park had a

disagreement and Mr. Park, who was driving, "lashed out …" and hit Mother on her cheek resulting in "a little hematoma . . . ."

Mother further testified that on April 28, 2004, she, her children, two of her children's friends, and Mr. Park were in Mr. Park's jeep returning from a restaurant. Mother testified that she and Mr. Park each had consumed a couple of drinks during the hour and a half they had been at the restaurant. Mother admitted that her daughter and the daughter's friend were riding in the cargo area of the jeep and were not wearing seat belts. Mother testified that the jeep was pulled over by the police approximately one mile from her house and that Mr. Park, who was driving, was given sobriety tests and then arrested.

Mother testified that she is taking a prescription medication as a result of her anxiety and sickness and that this medication can make her sleepy or groggy. She testified that this medication interacts with a strong pain killer she is taking for an injury to her finger and that the combination "knocks me out." Mother testified that she was taking these medications on the Friday when her son and Mr. Park had a fight.

Mother also admitted that on May 16, 2004, less than one week prior to trial, she became sick in the car while on the way home from a restaurant with Mr. Park and took her pants off. Mother testified that after being sick and removing her pants, she fell asleep. Mother admitted that she consumed alcoholic beverages while at the restaurant, but denied being drunk. She testified that the next thing she knew, Father was carrying her into her house.

Mother admitted that her son had been suspended from school the day prior to trial for taking a pen/letter opener with a blade to school. The pen/letter opener belongs to Mr. Park and Mother testified that her son got the pen/letter opener from a box at her home. Mother admitted that she did not call Father to tell him about the suspension.

Roger Park testified that he is taking anger management classes as a result of "a bargain with the district attorney. . ." regarding a domestic violence charge connected to the December 19 incident Mother testified about. Mr. Park admitted that he was charged with false imprisonment and domestic assault. He also admitted that there was an occasion when he physically pulled Mother away from the computer. When asked if he and Mother fight, Mr. Park stated: "Not all the time. We sleep together, we eat together, we go to trips together. So we don't fight all the time." When questioned about bruises, Mr. Park stated: "She does bruise easily. I do, too." Mr. Park testified that Mother has hit him. When asked if Mother gave him a black eye, Mr. Park stated:

> Well, I bruise pretty easily, but - - she didn't beat me up and start hitting on me like it was a violent, violent fight in the Jeep. It was a - - it's something that I'm sorry about. It was an accident. Her reaction to it was a little bit, I think, premature. But we're not fighting all the time, if that's what you're trying to insinuate. I apologized and she apologized.

Mr. Park was questioned regarding the incident that Mother testified occurred on May 16, 2004, approximately one week prior to trial. He stated:

> She undid her trousers, they would say in England, and took them off. She did. Now, she had a long T-shirt on, …, much more than you'd have on in a swimming pool and she sat on a towel, she did, and said, 'I've got to pee,' and she did. But, …, she threw up.

Mr. Park testified that he got Father to help get Mother out of the vehicle when they arrived home. Mr. Park stated:

> I did that - - I feel good about that because I wanted him to come, not to see [Mother] wasted and tired and hurting, but I thought - - because [Father] had been getting nicer and nicer - - I thought, wouldn't it be nice to have [Father] just come down, let's get her to bed. I thought that fostered both your relationship with [Father] and me and to show [Father] that even though she didn't have her knickers on, but covered, it was okay. And that was my reason, for sure.

Mr. Park was questioned about Mother's consumption of alcohol and when asked if Mother had been drinking on one specific occasion he replied, "I don't think she had.… [O]n her worst day she would never drink. That's something, isn't it, if she's an alcoholic?"

Officer Jennifer Hughes of the Cleveland Police Department testified regarding the incident that Mother testified occurred on April 23, 2004, during the drive to the school fair. Officer Hughes testified that she received a call regarding a female who had exited a vehicle at the school fair and who apparently had been in a fight of some sort. Officer Hughes went to the school where she spoke with Mother who told Officer Hughes that her boyfriend had hit her in the vehicle and then dropped her and her daughter off at the school. Officer Hughes observed that Mother "had a black eye, bloody lip, and there was blood on her shirt and also she showed me some bruises on her arms." Officer Hughes testified that Mother told her that the boyfriend's name was Roger Park. Officer Hughes further testified that Mother told her that this wasn't the first time Mr. Park had hit her. Officer Hughes testified she advised Mother about available help, such as shelters, and that Mother told her that she was planning on leaving Mr. Park after the court case regarding custody.

Officer Labron Ensley of the Cleveland Police Department testified that while he was on duty on the weekend before trial, he received a call coming from Mother's home. Officer Ensley testified that when he arrived at Mother's house, the parties' children met him at the door and the boy stated to Officer Ensley that he had made the 911 call because he had a fight with Mr. Park. Officer Ensley testified that the boy explained that he had been trying to wake Mother but was unable and that Mr. Park had tried to pull him away from Mother. Officer Ensley testified that the boy told him when Mr. Park tried to pull him away from Mother, the boy threw a cup of water at Mr. Park and that Mr. Park then kicked the boy in the chest. Officer Ensley entered Mother's house and tried to wake Mother, but also was unable to do so. Officer Ensley testified that while the officers

investigated, the children continued to attempt to arouse Mother, and that they finally were able to do so.

Lisa Ellis, the wife of Father's boss, testified at trial. Ms. Ellis testified that on the Friday before trial, she observed Mother and the parties' two children out at a restaurant with Mr. Park. Ms. Ellis testified that Mother was slurring her words, was swearing a lot, and smelled strongly of alcohol.

Officer Joshua Nix of the Cleveland City Police Department testified that on the Friday prior to trial, he received a call to assist another officer and went to Father's house. Officer Nix testified that he observed Father in his driveway unsteady on his feet, with a heavy odor of alcohol on his breath, and with glassy eyes. Officer Nix testified that he felt that Father was inebriated.

Father testified that the night Officer Nix observed him drunk, he was trying to get to Mother's house because he was concerned for his children's safety. Father testified that Mr. Park had come over to Father's house and told Father that he and the parties' son had an argument and that Mr. Park had pushed the boy. Father further testified that Mr. Park told him that Mother was on the floor unconscious. Father testified that Mr. Park spent the remainder of that night at Father's house. Father admitted that since the court date in July of 2003, he had consumed alcoholic beverages on numerous occasions, sometimes while the children were in his care, but that he had not drunk to excess in front of the children.

The Trial Court entered its Final Decree of Divorce on July 7, 2004. The Trial Court in its Final Decree found and held, *inter alia*, that the parties were granted a divorce and that Father would be designated the primary residential parent with Mother restricted to no overnight shared parenting time due to a finding of her alcohol abuse. The Final Decree also imposed certain conditions on Mother before the Trial Court would consider overnight co-parenting time. The Final Decree incorporated the permanent parenting plan which, among other things, required Mother to undergo an independent assessment for alcohol abuse and stated "UNTIL SUCH TIME AS THE COURT IS SATISFIED THAT THE ASSESSMENT IS PROPERLY COMPLETED AND THAT THE MOTHER'S ALCOHOL USAGE POSES NO THREAT, THE CHILDREN SHALL NOT STAY OVERNIGHT WITH THE MOTHER." The permanent parenting plan provided that Mother could petition the Trial Court for review regarding overnight parenting time after she satisfied the requirements placed on her. The permanent parenting plan also provided that neither party will have an overnight guest of the opposite gender who is a non-family member while the children are present for visitation, and that neither party will consume alcohol or any illegal substance while the children are present. Mother appeals to this Court.

## Discussion

While Mother raises two issues on appeal, the dispositive issue is whether the Trial Court erred in designating Father as the primary residential parent with Mother to have no overnight shared parenting time due to a finding of her alcohol abuse.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). In applying this standard of review, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves," appellate courts "are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The courts' paramount concern in a custody case is the welfare and best interest of the parties' minor children. *Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. Ct. App. 1996); *Koch*, 874 S.W.2d at 575. This determination necessarily turns on the particular facts of each case. *Koch*, 874 S.W.2d at 575.

Tenn. Code Ann. § 36-6-106(a) requires a trial court to consider all relevant factors when making a custody determination, including but not limited to:

> (1)  The love, affection and emotional ties existing between the parents and child;
>
> (2)  The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;
>
> (4)  The stability of the family unit of the parents;
>
> (5)  The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older.  The court may hear the preference of a younger child upon request.  The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred.  The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto.  In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;  and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2004).

In addition to the foregoing, Tenn. Code Ann. § 36-6-101(d) establishes "the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party."  Tenn. Code Ann. § 36-6-101(d) (2004).

Mother argues, in part, that the Trial Court erred when applying the best interest test and making a comparative fitness analysis because it failed to consider that Mother had been the primary caretaker for most of the children's lives, that Mother has maintained contact with Father's extended family, and that Father has been unwilling to encourage a close and continuing relationship between the children and Mother.  Mother also argues that the Trial Court erred in basing its custody decision upon the fact that Mother admitted to extramarital affairs.

Mother apparently overlooks the Trial Court's finding that Mother is abusing alcohol. The evidence shows numerous instances that occurred mere weeks prior to trial when Mother's alcohol consumption impacted her ability to care for the children. The evidence shows that on April 28, 2004, Mother got into Mr. Park's jeep and allowed her children and their friends also to get into the jeep with Mr. Park who, during the drive home was stopped by police and arrested for D.U.I. In addition, on that occasion, Mother admitted that her daughter and the daughter's friend were riding in the cargo area of the jeep without using seat belts. The evidence also shows that Mother admitted that on the Friday before trial, she was taking a combination of medications that 'knocked her out,' effectively leaving her children without assistance when her son and Mr. Park fought. The children were forced to call 911 themselves on this occasion, and Officer Ensley testified that he was unable to wake Mother. The evidence further shows that one week prior to trial, Mother got drunk, threw up in the vehicle on the way home, removed her pants, and urinated on a towel. The evidence further shows that on the Friday prior to trial, Ms. Ellis observed Mother at a restaurant with Mr. Park and the children. Ms. Ellis also observed that Mother was slurring her words, was swearing a lot, and smelled strongly of alcohol. The evidence does not preponderate against the Trial Court's finding that Mother is abusing alcohol.

Mother argues that the evidence shows that Father also drinks and that the Trial Court did not properly consider this evidence. However, the Trial Court did consider the testimony of Officer Nix and Father regarding this incident and noted that Father did not have custody of the children at the time. The record is devoid of evidence showing any instances when Father drank to excess while the children were in his custody. Father admitted to sometimes consuming alcoholic beverages while the children were in his care, but there is no evidence that this consumption was excessive or that Father was rendered incapable of parenting at those times.

We do, however, remind both parties that the permanent parenting plan incorporated into the Trial Court's July 7, 2004 order mandates that "[n]either party shall consume alcohol or consume any illegal substance … while the minor children are present for the purpose of visitation," and that "[a]ny and all violations of this permanent parenting plan shall be regarded as the equivalent of contempt of court and shall be punished as such by a court of competent jurisdiction."

In addition, we note that the evidence shows that Mother has exposed the children to Mr. Park who, the evidence shows, has hit Mother, kicked the parties' son, been arrested for D.U.I. while driving with the children and two of their friends in the vehicle, and been charged with false imprisonment and domestic assault. The evidence shows that Mother has failed to exercise good judgment regarding the safety and well-being of her children. The Trial Court did consider all relevant evidence when making the custody determination. We find no error in the Trial Court's designation of Father as the primary residential parent with Mother's visitation being restricted because of her alcohol abuse.

Mother requested that Father be ordered to attend anger management classes. The evidence presented during the first trial of this matter shows that Father hit Mother on several occasions. In addition, one of Father's friends, Thomas Stephen Webster, testified that Father's

discipline of the children "[o]ccasionally . . . goes over the top …." Given this evidence, we find Mother's request for an order directing that Father attend anger management classes to be well taken as being in the children's best interest.

We remand this case to the Trial Court for entry of an order requiring Father to attend and complete an anger management course, and we affirm the Trial Court's July 7, 2004 Final Decree as so modified.

## Conclusion

The judgment of the Trial Court is modified such that on remand Father is to be ordered to attend and complete an anger management course, and the judgment is affirmed as so modified. This cause is remanded to the Trial Court for action consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellant, Deborah Watkinson, and her surety.


_____
D. MICHAEL SWINEY, JUDGE